# Illinois Official Reports

## Appellate Court

---

### *People v. Pollard*, 2015 IL App (3d) 130467

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ASTRIA POLLARD, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0467 |
| Filed | June 2, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 11-CF-870; the Hon. Stephen Kouri, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jay Wiegman (argued), of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jerry Brady, State's Attorney, of Peoria (Judith Z. Kelly (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Presiding Justice McDade dissented, with opinion.

**OPINION**

¶ 1        After a bench trial, defendant, Astria Pollard, was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)), involuntary manslaughter (720 ILCS 5/9-3(a) (West 2010)), and endangering the life or health of a child (720 ILCS 5/12-21.6(a) (West 2010)) relating to the death of her two-month-old son. Defendant was sentenced on the first degree murder charge to 29 years in prison. Defendant appeals the first degree murder conviction, arguing that she was not proven guilty beyond a reasonable doubt because the State failed to prove that she knew that her conduct created a strong probability of death or great bodily harm to her child. We affirm the trial court's judgment.

¶ 2                                        FACTS

¶ 3        On September 13, 2011, defendant was charged with two counts of first degree murder and one count of endangering the life and health of a child in connection with the death of her two-month-old son, J.P. Count I of the indictment alleged that defendant, without lawful justification and while under a duty to provide care for J.P., committed first degree murder in that she knowingly withheld adequate nutrition and hydration from J.P., knowing those acts would cause great bodily harm or death to J.P. and thereby causing the death of J.P. Count II of the indictment alleged that defendant, without lawful justification and while under a duty to provide care for and monitor the health of J.P., committed first degree murder in that she knowingly withheld adequate nutrition and hydration from J.P. and ignored his heart and apnea monitor knowing those acts would cause great bodily harm or death to J.P. and thereby causing the death of J.P. Count III of the indictment alleged that defendant committed the offense of endangering the life and health of a child in that she willfully caused or permitted the life or health of J.P. to be endangered by failing to provide adequate nutrition and hydration to J.P. and by ignoring his heart and apnea monitor functions and that those violations were a proximate cause of the death of J.P.

¶ 4        Defendant's case proceeded to a bench trial in September 2012. The evidence presented at trial established that at the age of 15, defendant gave birth to S.P., the first of her three children. S.P. was cared for by defendant's mother. Shortly after the birth of S.P., defendant dropped out of high school in her freshman year. At the age of 16, defendant gave birth to her second child, L.J. The father of L.J., Landrean J., was not the father of S.P. L.J. lived with, and was cared for by, Leslie J., Landrean's mother. At the time, defendant lived with her mother, who was still caring for S.P.

¶ 5        On July 6, 2010, the then-18-year-old defendant gave birth to her third child, J.P., the infant who died in this case. J.P. was born prematurely at just under 30 weeks gestation and weighed only 2½ to 3 pounds. According to defendant, she did not know that she was even pregnant at the time. Because of his fragile condition, J.P. remained in the hospital for about a month and was provided with around-the-clock medical care from the hospital staff. During that time

period, defendant visited J.P. at the hospital on occasion but was not a daily visitor, even though she lived only a few miles from the hospital.

¶ 6    On August 7, 2010, J.P. was healthy enough to be discharged from the hospital and to defendant's care. J.P. weighed a little over four pounds, was growing appropriately, and was feeding from a bottle. Because of defendant's lack of frequent visits to the hospital, the hospital staff members were concerned about defendant's ability to care for J.P. To assist defendant in doing so and to alleviate some of those concerns, the hospital provided to defendant at no cost to her: (1) a heart and apnea monitor; (2) a car seat/carrier (carrier); (3) baby formula; (4) bottles; (5) diapers; (6) a prescription of caffeine, which would help stimulate J.P.'s breathing; (7) information on public aid sources for refilling the prescription; and (8) access to home health nurses who would regularly visit defendant to assist her with J.P. and to monitor J.P.'s condition. In addition, the hospital staff made sure that defendant knew how to feed J.P. a bottle, to add caffeine to the bottle, and to change J.P.'s diaper. The hospital staff members had defendant perform those tasks in their presence so that they could confirm that defendant was able to perform the tasks correctly.

¶ 7    Defendant was also given numerous instructions to follow in caring for J.P. A training session was scheduled for defendant to be trained on the use of the heart and apnea monitor, but defendant failed to show up for that session. A second training session was scheduled, for which defendant arrived late. Defendant was told during the training session that the heart and apnea monitor was to be kept on J.P. at all times, except when he was being bathed, and that the monitor's alarm would sound if J.P. stopped breathing or if his heart rate was too high or too low (collectively described as an event). When the alarm sounded, lights on the monitor would light up to indicate the type of event that was occurring. The alarm on the monitor would continue going off until the event had ended, but the indicator light would remain lit until the monitor was reset. Defendant was told that if the alarm went off and she could not quickly resolve the problem with J.P., she was to immediately call 9-1-1. Defendant was also given a 24-hour hotline number to call if she had any questions or concerns about the functioning of the monitor.

¶ 8    Additional instructions that defendant received pertained to the carrier and to feedings. Defendant was told not to leave J.P. in the carrier for an extended period of time beyond 90 minutes and to never place J.P. in the carrier facedown. Defendant was also instructed that J.P. had to be fed (given a bottle of formula) every three hours around the clock and that she was to wake J.P. up to be fed if he was sleeping at a time when a feeding was due. Defendant was told to put a certain amount of the caffeine into J.P.'s bottle each morning or in the afternoon if she forgot.

¶ 9    Upon leaving the hospital with J.P., defendant resided at Leslie's residence with Leslie, Landrean, Shirley J. (Leslie's mother), and L.J. (defendant and Landrean's daughter). Defendant's other child, S.J., continued to reside with defendant's mother. While living at Leslie's residence, defendant slept in an upstairs bedroom on a mattress on the floor with Landrean, and, at times, with L.J. Despite the instructions she had been given, defendant had J.P. sleep next to them on the floor in his carrier.

¶ 10    During the first three weeks of defendant and J.P.'s stay at Leslie's house, Leslie provided a substantial amount of J.P.'s care and did many of the feedings. J.P. remained healthy and continued to grow during that time period. At a doctor appointment on August 25, 2010, J.P. was examined from head to toe and was considered to be healthy and doing well. His weight

had climbed to 4.62 pounds. After that three-week period, however, Leslie decided to step back and to let defendant take on a larger role in caring for J.P.

¶ 11    After defendant started being the primary caregiver for J.P., J.P.'s health began to deteriorate. Defendant had to be prompted repeatedly by other members of the household to feed and check on J.P., although she did make efforts to do so after the prompting had occurred. When the prescription for caffeine ran out, defendant did not have the prescription refilled because she allegedly did not have the money. Defendant's only source of income at the time was $200 per month that her mother would give her from a public assistance account, and she did not attempt to use the public aid sources that the hospital had given her to have the prescription refilled. At times, J.P. would not feed well for defendant. Leslie, however, still tried to feed J.P. when she had time and apparently had no problem doing so. On one occasion a few days before J.P.'s death at about 10 or 10:30 a.m., Leslie went into the bedroom after she heard J.P. making a muffled crying sound and found J.P. facedown in the carrier struggling for breath. J.P. had his heart and apnea monitor on his body, but the monitor itself was turned off. Leslie woke up defendant, who was sleeping in the bed.

¶ 12    On September 20, 2010, at 4:49 a.m., the heart and apnea monitor sounded a series of alarms because J.P.'s heart rate was over 230 beats per minute. The alarm sounded 7 times in a 50-minute period before being shut off at 5:39 a.m. The monitor was turned back on about two hours later. During that day, Leslie fed J.P. at least one of his bottles. According to Leslie, J.P. fed well at that time and she did not notice anything about J.P. that caused her concern.

¶ 13    The following day, on September 21, 2010, defendant took J.P. to see defendant's mother. During the visit, defendant's mother told defendant that J.P. did not look well and that she should take J.P. to the doctor. Defendant did not do so. Defendant tried to feed J.P. a bottle later that night at about 8 or 9 p.m., but J.P. would not take the bottle.

¶ 14    On September 22, 2010, at 5:38 a.m., the heart and apnea monitor sounded an alarm approximately 10 times in a 14-minute period because J.P.'s heart was beating over 230 beats per minute. Defendant woke up, turned the alarm off, and went back to sleep. Shortly after 8 a.m., defendant got up and went downstairs. She left J.P. in his carrier in the upstairs bedroom. Present at the residence at that time were Leslie, Landrean, defendant, L.J., J.P., and Landrean's cousin, Da'Rian B., who had stopped by earlier that morning. Leslie left for work at about 8:35 a.m., and Da'Rian's friend or girlfriend, Daejunique B. (Daja), arrived at the residence at about 9:30 a.m. According to Landrean, at some point between 11 and 11:30 a.m., he told defendant to go check on J.P. because J.P. was not moving like he normally did. Defendant later denied that Landrean told her any such thing. At about 11:30 a.m., Landrean left the residence to go to the plasma center. While he was at the plasma center, Landrean had a text-message conversation with defendant. Defendant told Landrean that she missed him, that she was "horny," and that she would perform oral sex on him when he got home. At about 12 p.m., while defendant, Da'Rian, and Daja were all in the living room, Da'Rian told defendant to go check on J.P. According to Daja, prior to that time, she was not even aware that there was a baby in the house. Defendant went upstairs and came back down a short while later with J.P. in the carrier. As soon as defendant came into the living room, J.P.'s heart and apnea monitor sounded an alarm. Defendant was in a panic. J.P.'s face was blue, his hands were balled up, and he was not breathing. Daja took J.P. out of the carrier and tried to determine what was wrong with him, while defendant or Da'Rian called 9-1-1. Following the instructions of the 9-1-1 operator, Da'Rian performed cardiopulmonary resuscitation on J.P. until help

arrived shortly thereafter. Defendant told the first emergency person that arrived that she did not know what had happened and that J.P. was moving less than 10 minutes earlier. J.P. was rushed to the hospital and resuscitation efforts were made, but they were unsuccessful. While trying to treat J.P., the emergency room doctor noticed that rigor mortis had already set in and that J.P.'s body temperature was only 89 degrees. J.P. was declared dead on September 22, 2010, at 1:10 p.m. J.P.'s weight at the time of his death was 4 pounds, 6.6 ounces.

¶ 15    Officials began to question defendant at the hospital because of J.P.'s death and his condition at the time of his death. J.P. was extremely dehydrated and emaciated, his ribs and vertebrae were showing, and his fontanel and eyes were sunken in. Defendant was unemotional at the time. Defendant initially stated that she had fed J.P. at 8 or 9 o'clock that morning and again at 11:30 a.m. or 12:30 p.m. and that J.P. appeared to be fine at those times. A later conducted autopsy indicated, however, that J.P. had been dead for several hours and that he had died from dehydration and malnourishment due to neglect, with J.P.'s prematurity being a contributing factor.

¶ 16    The forensic pathologist who conducted the autopsy on J.P. found no food in J.P.'s stomach or small intestine and only one drop of urine in J.P.'s bladder. Based upon the lack of any type of food (formula) in J.P.'s stomach or intestines, the forensic pathologist opined, conservatively, that J.P. had not had anything to eat for a minimum of 6 to 12 hours and that J.P. had missed 2 to 4 of his last feedings and possibly a lot more. According to the forensic pathologist, J.P. was starving–he had no fat stores and his muscle tissue had atrophied. The malnutrition was a chronic condition that had gone on for some time. In addition, J.P. was dehydrated to the point where his blood had become sludge-like, and blood pooling in J.P.'s body indicated that J.P. had been lying on his stomach when he died. Based upon the level of dehydration present in J.P.'s body, the forensic pathologist estimated that J.P. had not had any liquids for a minimum of 12 to 24 hours before he died. When told about the series of alarms on J.P.'s heart and apnea monitor at 5:38 a.m. on September 22, the forensic pathologist opined that the high heart rate was caused by dehydration and that J.P. likely died a few minutes thereafter. The forensic pathologist opined further, however, that J.P. could have been saved if he had been brought to the hospital immediately after the alarms had sounded that morning.

¶ 17    Expert testimony presented at trial indicated that because of J.P.'s premature condition, he had a very tight window of required care and had to be fed every three hours, around the clock. Without such feeding, J.P. would become dehydrated and would suffer malnutrition within a 12- to 24-hour period. Once dehydration and malnutrition set in, a baby in that condition could become too weak to take food from a bottle and would rapidly starve to death. According to the experts, however, even under those circumstances, if professional medical care was sought promptly, treatment providers would likely be able nourish the baby back to health through rapid intravenous feeding.

¶ 18    Defendant gave two lengthy videotaped statements to police, one on September 22, 2010, and the other on October 1, 2010. During those statements, defendant gave numerous different accounts on what had happened in the day or days leading up to J.P.'s death. Defendant's version of events changed repeatedly as to how often she would put J.P. in the carrier, how long she would leave J.P. in the carrier, whether she would lay J.P. in the carrier faceup or facedown, when she last tried to feed J.P., when she checked on J.P. during the morning of September 22, whether the heart and apnea monitor was working properly, and how the

monitor got turned off that morning. After watching defendant's videotaped statements, the trial judge characterized defendant's demeanor during those statements as unemotional.

¶ 19 The records from the monitor itself showed that the monitor had been turned off at 5:52 a.m. on September 22 and that it was not turned back on until 12:45 that afternoon. Additional testimony indicated that as a safety feature to prevent accidental turn off, two buttons or switches on the monitor had to be pushed at the same time to turn the monitor off. According to the expert who reviewed the monitor records, there had been four or five nights during the approximately one-month period leading up to J.P.'s death when the monitor had been shut off for the entire night.

¶ 20 Additional evidence presented at trial, some of which was defendant's own statements, showed that defendant had not used the home health nurses that the hospital had arranged for her. Defendant gave the nurses her mother's address, rather than Leslie's address, and did not return the nurses' phone calls when they called her and tried to set up home health visits. Defendant commented in her statement that she chose not to use the home health nurses because she wanted to feel like she could take care of J.P. on her own.

¶ 21 During the bench trial, after all of the evidence had been presented, the trial court asked the attorneys to provide authority on the question of whether defendant's conduct constituted first degree murder or involuntary manslaughter. The attorneys did so. The trial court later issued a lengthy written decision. The trial court found as to count I, which alleged only the failure to provide adequate nutrition and hydration, that defendant was guilty of the lesser-included offense of involuntary manslaughter. In so doing, the trial court stated that it could not find that the withholding of food and water, under the totality of the evidence, was done with knowledge by defendant of a strong probability of death. As to count II, however, which alleged both the failure to provide adequate nutrition and hydration and the failure to provide medical care by reason of defendant ignoring the heart and apnea monitor alarms, the trial court found that defendant was guilty of first degree murder because there was a high probability that death or great bodily harm would result to a premature infant, such as J.P., under those circumstances. The trial court stated that defendant's conduct in this case was similar to an example in a legal treatise regarding a person firing a gun into a crowded room–in that a high probability of death or great bodily harm was likely to follow. The trial court opined that it was not a mitigating factor that defendant had turned off the alarm just two days earlier during a similar incident with no death occurring and stated that a kindergarten teacher could not ignore a fire alarm and continue to teach simply because two days earlier there was a false fire alarm. According to the trial court, "[w]hen defendant dismissively turned the alarm off at 5:52 a.m., as if it were a snooze button on an alarm clock, she knew her actions created a strong probability of death or great bodily harm." As noted above, the trial court also found defendant guilty of count III, endangering the life and health of a child.

¶ 22 Defense counsel subsequently filed a motion for new trial, alleging that defendant had not been proven guilty beyond a reasonable doubt. The trial court denied the motion and proceeded to sentencing on the first degree murder charge. Because the victim, J.P., was under the age of 12, defendant faced a sentencing range of 20 to 100 years in prison. The evidence presented at the sentencing hearing showed, among other things, that defendant suffered from a physical disability and was unable to use her left arm; that defendant had no criminal history; that defendant had only a borderline intelligence; that defendant functioned at about a third- or fourth-grade reading and comprehension level; and that defendant's judgment, insight, and

ability to reason abstractly were all mildly impaired because of her limited cognitive ability. The evidence also showed that in June 2009, defendant gave birth to stillborn twins in her then-boyfriend's home. Defendant placed the fetuses in plastic bags, set them outside the house, and did not contact medical personnel or authorities until about six hours later. In June 2011, before she was charged in this case, defendant gave birth to her sixth child. In considering the appropriate sentence to impose, the trial court commented that the "reality [was] that [defendant] couldn't care for a child, much less a child in the condition of [J.P.], a baby," and that it did not believe that defendant could even take care of herself. At the conclusion of the sentencing hearing, the trial court sentenced defendant to 29 years in prison. After her motion to reconsider her sentence was denied, defendant filed this appeal.

¶ 23                                                       ANALYSIS

¶ 24         On appeal, defendant argues that she was not proven guilty beyond a reasonable doubt of the first degree murder of her infant son, J.P. Defendant asserts that the State failed to prove that she had the requisite mental state for first degree murder as charged in count II of the indictment in the present case–knowledge that her actions created a strong probability of death or great bodily harm to J.P. At worst, defendant contends, her conduct was done recklessly, not with the mental state of knowledge. More specifically, defendant contends that: (1) it was impossible for the trial court to find that the knowledge element had been proven under count II of the indictment based upon both defendant's failure to provide adequate nutrition and hydration for J.P. and defendant's ignoring of J.P.'s heart and apnea monitor when the trial court had already found that the first half of that conduct–the failure to provide adequate nutrition and hydration–was done recklessly, rather than with knowledge that it would cause death or great bodily harm to J.P., as evidenced by the trial court's finding of guilty to the lesser-included offense of involuntary manslaughter on count I of the indictment; (2) a rational trier of fact could not have found from the facts of this case that defendant knew that her failure to respond to the series of alarms from the heart and apnea monitor on September 22 created a strong probability of death or great bodily harm to J.P., especially since defendant's past experience with the monitor during the similar incident on September 20 had shown her that a series of alarms did not necessarily mean that J.P. was in danger of imminent harm; (3) the analogies made by the trial court in making its decision regarding a person firing a gun into a crowded room and a teacher ignoring a fire alarm were not applicable and had no basis in the facts of this case or in the law; (4) the State failed to prove that defendant ignoring the heart and apnea monitor was the cause of J.P.'s death, as the State had charged in count II of the indictment; (5) the lack of any published case with a comparable fact pattern to the instant case shows that the circumstances of J.P.'s death were unique and that defendant could not have foreseen that her actions in this case would lead to such dire consequences; and (6) defendant's conduct as alleged in count II of the indictment much more closely approximated involuntary manslaughter, rather than first degree murder, as the trial court correctly found as to count I of the indictment. For all of the reasons stated, defendant asks that we reverse her first degree murder conviction outright, or, if we believe that defendant had acted recklessly, that we reduce her first degree murder conviction to involuntary manslaughter and that we remand this case for defendant to be sentenced on that charge.

¶ 25         The State argues that the evidence was sufficient to prove beyond a reasonable doubt that defendant acted with knowledge that her conduct, as alleged in count II of the indictment,

created a strong probability of death or great bodily harm to J.P. and that defendant's conviction for first degree murder, therefore, should be upheld. The State asserts the trial court's ruling that the knowledge element had been proven was supported by the following findings of fact, made by the trial court, which were not manifestly erroneous: (1) when J.P. was discharged from the hospital on August 7, 2010, he was a healthy, growing, premature baby; (2) because of J.P.'s premature condition, he had to be fed every three hours around the clock; (3) without such feedings, J.P. would become dehydrated and suffer malnutrition within 6 to 12 hours; (4) once dehydration and malnutrition set in, J.P. could have become too weak to take food from a bottle; (5) although defendant had been told of the reason for adding caffeine to J.P.'s bottle, had been instructed how to do so, had been given a prescription for caffeine, and had been given public aid resources to refill that prescription, she failed to obtain more caffeine after the initial prescription ran out one to two weeks prior to J.P.'s death; (6) defendant had not fed J.P. every three hours, even though she had been instructed to do so; (7) defendant did not use the services of a home health nurse, even though those services had been arranged for her by the hospital staff; (8) defendant kept J.P. in the carrier much longer than what she was instructed was permissible; (9) defendant had put J.P. in the carrier facedown although she had been instructed not to do so; (10) defendant was provided with a heart and apnea monitor for J.P., instructed on its use, and told to keep it connected to J.P. at all times, except when J.P. was being bathed, but she did not do so; (11) defendant was told to call 9-1-1 if the alarm on the monitor went off and the problem with J.P. could not be resolved immediately, but she failed to do so; (12) defendant had been given a 24-hour hotline number to call if she had any questions or concerns about the monitor; (13) defendant had provided a number of untrue versions of what had occurred prior to J.P.'s death; (14) defendant knew that J.P. had been on his stomach in the carrier for seven hours without feeding and that the alarm had sounded numerous times in a row when she shut the monitor off and went back to sleep instead of checking on J.P. or calling for help; (15) after shutting the monitor off at 5:52 a.m. on September 22, defendant did not turn the monitor back on until 12:45 p.m. that day; and (16) defendant lied to the medical treatment providers and to police, insisting that J.P. had been feeding well every three hours. The State asserts further that it disagrees with defendant's claim that she could not have known that turning off J.P.'s monitor on September 22 created a strong probability of death or great bodily harm to J.P. since she had done the same thing two nights before with no harm resulting to J.P. According to the State, if that claim were taken to its logical conclusion, there would be no need for defendant to even connect J.P. to the monitor because her past experience had taught her that a monitor alarm did not necessarily indicate a threat of imminent harm to J.P. The State asserts in addition that because of J.P.'s failure to feed, defendant knew that J.P.'s condition was much worse on September 22 (the second incident of repeated alarms) than it was on September 20 (the first incident of repeated alarms). The State also does not agree with defendant's claim that it failed to prove that turning off the heart and apnea monitor was the cause of J.P.'s death. In response to that claim, the State points out that the medical experts testified that J.P.'s medical issues could have been reversed and that J.P. could have been saved if defendant would have sought prompt medical treatment after the alarms sounded on September 22. For all of the reasons set forth, the State asks that we reject defendant's argument on this issue and that we affirm defendant's conviction of first degree murder.

¶ 26        Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). Under the *Collins* standard, "a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *People v. Austin M.*, 2012 IL 111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of review gives " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Jackson*, 232 Ill. 2d at 281 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial or whether defendant received a bench or a jury trial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *Jackson*, 232 Ill. 2d at 281; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). In applying the *Collins* standard, a reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 27        A defendant is guilty of first degree murder when he kills a person without lawful justification and knows at the time that his acts created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2010); Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000); *People v. DiVincenzo*, 183 Ill. 2d 239, 249-50 (1998). A defendant is guilty of involuntary manslaughter, on the other hand, when he unintentionally kills a person without lawful justification by recklessly performing acts that are likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2010); Illinois Pattern Jury Instructions, Criminal, No. 7.08 (4th ed. 2000); *DiVincenzo*, 183 Ill. 2d at 250. The difference between first degree murder and involuntary manslaughter is the mental state that accompanies the conduct resulting in the victim's death. *DiVincenzo*, 183 Ill. 2d at 249. " 'The mental state for murder is knowledge, while the mental state for involuntary manslaughter is recklessness.' " *People v. Weeks*, 2012 IL App (1st) 102613, ¶ 34 (quoting *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010)). A person acts knowingly or with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result (720 ILCS 5/4-5(b) (West 2010); Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000); *Weeks*, 2012 IL App (1st) 102613, ¶ 34), whereas a person acts recklessly or with recklessness when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care a reasonable person would use in that situation (720 ILCS 5/4-6 (West 2010); Illinois Pattern Jury Instructions, Criminal, No. 5.01 (4th ed. 2000); *Weeks*, 2012 IL App (1st) 102613, ¶ 34). The mental state required may be inferred from the character of the defendant's acts and from the circumstances surrounding the commission of the offense (*People v. Tye*, 141 Ill. 2d 1, 15 (1990); *DiVincenzo*, 183 Ill. 2d at 252; *Weeks*, 2012 IL App (1st) 102613, ¶ 34), and the trier of fact is in the best position to determine whether a particular mental state is present (see *DiVincenzo*, 183 Ill. 2d at 252).

¶ 28 In the instant case, there is no dispute that J.P. died as a result of defendant's conduct. The only question is whether that conduct amounted to the mental state of "knowledge" as required for first degree murder, the mental state of "recklessness" as required for involuntary manslaughter, or some lesser mental state as required for an outright reversal. The distinction is based upon the level of certainty that death or great bodily harm would result from defendant's conduct. See 720 ILCS 5/4-5(b), 4-6 (West 2010); *DiVincenzo*, 183 Ill. 2d at 252; *Weeks*, 2012 IL App (1st) 102613, ¶ 34. When we view the evidence in the light most favorable to the State and consider that defendant was told at the hospital that J.P. had to be fed every three hours and that the heart and apnea monitor was not to be turned off unless she was giving J.P. a bath, we find that the evidence was sufficient to establish that defendant acted with "knowledge" that her acts created a strong probability of death or great bodily harm to J.P. See *Jackson*, 232 Ill. 2d at 280; *DiVincenzo*, 183 Ill. 2d at 249-52; *Weeks*, 2012 IL App (1st) 102613, ¶ 34. Despite the instructions defendant had been given, she had not provided nutrition or hydration to J.P. for several hours, had stopped drawing a dosage of caffeine into J.P.'s bottles as necessary to stimulate his breathing, had placed J.P. in his carrier facedown for a lengthy period of time, had shut off the heart and apnea monitor during a period of repeated alarms, had left the monitor off for several hours, and had gone back to sleep without checking on J.P. and without seeking immediate emergency medical treatment for J.P. We, therefore, affirm the trial court's ruling that defendant was guilty of first degree murder.

¶ 29 We are not persuaded to reach a conclusion to the contrary by the fact that defendant had only borderline intelligence; by the fact that the trial court found that the failure to provide nutrition and hydration was done recklessly, rather than knowingly; or by a concern over whether the trial court's analogies were applicable. Our role in this case is merely to determine whether, under the *Collins* standard of review, any rational trier of fact could have found that the knowledge element of the first degree murder charge had been proven beyond a reasonable doubt. See *Jackson*, 232 Ill. 2d at 280. Viewing the evidence in this case in the light most favorable to the State, as we are required to do, we believe that a rational trier of fact could have so found. See *Jackson*, 232 Ill. 2d at 280; *DiVincenzo*, 183 Ill. 2d at 249-52; *Weeks*, 2012 IL App (1st) 102613, ¶ 34. The evidence of defendant's knowledge, although circumstantial in this case as it often is (see *Tye*, 141 Ill. 2d at 15; *DiVincenzo*, 183 Ill. 2d at 252; *Weeks*, 2012 IL App (1st) 102613, ¶ 34), was not so improbable, unsatisfactory, or inconclusive as to leave a reasonable doubt of defendant's guilt. See *Austin M.*, 2012 IL 111194, ¶ 107. As the trier of fact, the trial court was in the best position to determine whether defendant had the requisite mental state for first degree murder as alleged in count II in the indictment. See *DiVincenzo*, 183 Ill. 2d at 252. Under the *Collins* standard of review, we cannot find that the trial court's determination in that regard was erroneous. See *Jackson*, 232 Ill. 2d at 280; *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 30                                              CONCLUSION

¶ 31 For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 32 Affirmed.

¶ 33        PRESIDING JUSTICE McDADE, dissenting.

¶ 34        The majority affirms the defendant's conviction for first degree murder despite the fact that the circuit court found in count I that the defendant recklessly failed to provide adequate nutrition and hydration to her son, but then found the same conduct to be performed knowingly with respect to count II. Because I cannot agree with this conclusion, I respectfully dissent from the majority's decision.

¶ 35        When faced with a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *Collins*, 106 Ill. 2d at 261.

¶ 36        At the time of J.P.'s death, the first degree murder statute provided, in relevant part:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> ***
>
> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(2) (West 2010).

An act need not be the sole and immediate cause of death to prove first degree murder, only that the act contributed to the victim's death. *People v. Brown*, 169 Ill. 2d 132, 152 (1996).

¶ 37        The involuntary manslaughter statute provided, in relevant part, that "[a] person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2010).

¶ 38        The difference between first degree murder and involuntary manslaughter, in essence, is the mental state behind the conduct that causes the victim's death. *People v. Leach*, 405 Ill. App. 3d 297, 312 (2010). First degree murder requires knowledge, which the Criminal Code of 1961 (Code) defines as:

> "A person knows, or acts knowingly or with knowledge of:
>
> (a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.
>
> (b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5 (West 2010).

¶ 39        Involuntary manslaughter requires recklessness, which the Code defines as:

> "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2010).

¶ 40        I believe the State failed to prove the defendant committed first degree murder. There is a dearth of evidence–circumstantial or otherwise–in the record to suggest that the defendant was

"consciously aware" that J.P.'s death was "practically certain to be caused by [her] conduct" (720 ILCS 5/4-5(b) (West 2010)). Contrary to the majority's view, this lack of evidence is not satisfied in favor of a conviction simply because she "was told at the hospital that J.P. had to be fed every three hours and that the heart and apnea monitor was not to be turned off unless she was giving J.P. a bath." *Supra* ¶ 28.

¶ 41 In addition, while the majority may not have been influenced by the defendant's borderline intelligence (*supra* ¶ 29), it certainly was not lost on the circuit court, as evidenced by the court's comment at sentencing that it did not believe the defendant could take care of J.P., or even herself. I agree with the circuit court that the defendant's borderline intelligence was an important factor in this case–one that, in my opinion, ought to be relevant to the question of whether the defendant acted knowingly or recklessly. But *cf. People v. Hulitt*, 361 Ill. App. 3d 634, 640-41 (2005) (discussing the doctrine of diminished capacity and noting that while Illinois does not recognize it as a defense, it may be used to counter the State's evidence that a defendant possessed the mental state required for a conviction). As the majority noted, testimony presented at sentencing indicated that the defendant functioned at the reading and comprehension level of a third- or fourth-grade child and that her judgment, insight, and capacity for abstract thought were mildly impaired due to her limited ability. *Supra* ¶ 22. I find it disturbing that, in essence, this case results in an adjudication that an individual who functioned at the age of an eight- or nine-year-old formed the requisite mental state to commit first degree murder.

¶ 42 More significantly, the circuit court found that the defendant did *not* act with knowledge when she withheld nutrition and hydration from J.P. with regard to count I but, rather, that she acted recklessly. However, for count II, the court raised her mental state to knowledge for that same conduct when it was combined with the additional allegation of her shutting off the heart and apnea monitor. I am not persuaded by the majority's claim that the *Collins* standard of review forgives this inconsistency in the court's reasoning, and this inconsistency leads me to the conclusion that no rational trier of fact could have concluded that the defendant committed first degree murder as alleged in count II after the court made the finding with regard to count I that her acts of withholding nutrition and hydration from J.P. were done recklessly. See, *e.g.*, *People v. Fornear*, 176 Ill. 2d 523, 531 (1997) (holding that "recklessness and knowledge are mutually inconsistent culpable mental states").

¶ 43 For the foregoing reasons, I respectfully dissent. I would reverse the defendant's conviction for first degree murder and remand for the circuit court to resentence the defendant for involuntary manslaughter.