NOTICE

Decision filed 04/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230414-U

NO. 5-23-0414

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 18-CF-126 |
| | ) | |
| JOHN PATRICK TUCKER, | ) | Honorable |
| | ) | Timothy D. Denny, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The evidence was sufficient to support the trial court's finding of the defendant's guilt; the trial court did not err in admonishing the defendant regarding his jury waiver; the probation condition restricting the defendant's access to social media websites is vacated.

¶ 2   The defendant, John Patrick Tucker, was charged with three counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2016)), one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)), and one count of aggravated battery (720 ILCS 5/12-3.05(c) (West 2016)). Before trial, the State dismissed the aggravated battery charge. The defendant waived jury and, following a bench trial, was convicted of four counts of aggravated criminal sexual abuse. The trial court sentenced the defendant to 48 months' probation, which included a condition that prohibited the defendant from accessing social media websites. For the

1

following reasons, we affirm the defendant's convictions and vacate the trial court's probation condition denying the defendant access to social media websites.

¶ 3                                    I. BACKGROUND

¶ 4      The defendant was arrested on June 21, 2018, and charged with four counts of aggravated criminal sexual abuse and one count of aggravated battery, all of which allegedly occurred in June 2018. At his arraignment, the defendant pled not guilty and requested a trial by jury. On August 16, 2018, the defendant substituted counsel with a new attorney, Robert Bateson. On October 10, 2019, the defendant waived his right to a jury trial, at which time, the trial court admonished the defendant as follows:

> "THE COURT: All right. I'm reading a document that says, Waiver of Jury Trial. It says, I state that I'm the defendant in this case. I understand that I have a constitutional right to a trial by jury of 12 people from Union County. Do you understand that?
>
> THE DEFENDANT: I do, Your Honor.
>
> THE COURT: You've been fully advised by Mr. Bateson as to what a jury trial is and understand that the jury would hear evidence in this cause and determine your guilt or innocence. By signing this waiver, it indicates that you understand you'll be giving up or waiving that constitutional right. Do you understand that?
>
> THE DEFENDANT: I do, Your Honor.
>
> THE COURT: There will be no jury trial. It will be scheduled for a trial in front of a judge like myself, possibly myself. I cannot guarantee that it will be me with the situation that we have in Union County here today. *Do you understand that once you waive your right to a jury trial that you cannot change your mind and go backwards*?
>
> THE DEFENDANT: I do, Your Honor.

THE COURT: Is this—did anyone make any threats or promises to induce you to do this that I haven't been told about?

THE DEFENDANT: No, sir, Your Honor.

THE COURT: Is it your free and voluntarily [*sic*] choice?

THE DEFENDANT: It is, Your Honor.

THE COURT: All right. I'm showing you a document entitled Waiver of Jury Trial at this point. Is this your signature that appears at the bottom?

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: Did your read through that, go over it with Mr. Bateson and did you understand it?

THE DEFENDANT: I do, Your Honor, and I did.

THE COURT: Pardon me?

THE DEFENDANT: I do, Your Honor, and I did.

THE COURT: Okay. I'm going to accept your waiver of jury trial, and we need to set this for, I suppose another pretrial—" (Emphasis added.)

¶ 5        On February 9, 2021, Attorney Bateson filed a motion to withdraw, and on March 26, 2021, Michael Wepsiec entered his appearance and filed a motion to suppress evidence obtained from the execution of two search warrants. The State confessed the motion, and the trial court excluded items seized pursuant to those two search warrants. In November 2022, the case was reassigned to a new judge, who held a status conference and set a trial date for a month later.

¶ 6        After numerous continuances and COVID-19, the defendant's bench trial began on January 26, 2023. The State called six witnesses: Officer Sanders, C.F., D.P., H.G., T.P., and Officer Adams. The defendant testified on his own behalf.

3

¶ 7    Officer Sanders testified that on June 20, 2018, while on patrol for the Village of Cobden, a family approached his squad car wanting to report a sexual assault. Officer Sanders met the family at the police department and took an initial statement. He was informed that the alleged victim was C.F. Officer Sanders notified the chief of police, and interviews with the Child Advocacy Center (CAC) were scheduled for the following day. CAC interviews were conducted for multiple minor children concerning allegations of sexual abuse by the defendant: C.F., D.P., H.G., and T.P. Officer Sanders confirmed that he was present when C.F.'s mother wrote out a statement for C.F.

¶ 8    C.F. testified that she was 10 years old in June 2018 and identified the defendant as the person who ran the antique shop in Cobden in 2018. She explained that she visited the shop a couple times each month with her friend, H.G. She described the shop, including the bedroom area where the defendant stayed. C.F. testified that when she made the report in 2018, either the same day of the assault or the next day, she told police the defendant touched her "front butt," explaining that is her vagina, and her "back butt," meaning her buttocks. She stated that she was in the back room, bedroom area, when she tried to leave, but the defendant blocked the door with his hand. She stated that the defendant began to tell her that her friend, H.G., did not like her, and while doing so, he touched her vagina and her butt, over the clothes, for two to three minutes. She demonstrated how the defendant touched her by doing a wiping motion with her hand. She stated that the defendant stopped touching her when H.G. came back from retrieving a water slide from her house next door. C.F. stated that she then went near the cash register in the shop, where the defendant could not see her. She then witnessed the defendant touch H.G.'s breast. C.F. also testified that the defendant often gave her gifts and small amounts of cash.

¶ 9    D.P. then testified that she was 15 years old in June 2018. She stated she knew the defendant as the owner of an antique shop in Cobden, and her friend H.G. had introduced her to the defendant. She would normally go to the shop with H.G. but sometimes with her brother, T.P. She described the shop, noting that the defendant let her keep her guinea pigs in his bedroom. During her statement with the CAC, she disclosed an incident where the defendant touched her breast. She stated that he was asking about a Bon Jovi necklace she was wearing. He lifted up the necklace and ran his hand down the front of her shirt, touching her breast. She described it as "not a grab" but "more of a caress" and demonstrated it for the trial court. D.P. also testified about gifts and cash the defendant had given to her on multiple occasions. She also stated that she once witnessed the defendant put a necklace on H.G., while putting his hand on H.G.'s breast over her shirt.

¶ 10    T.P. testified that he was 13 years old in June 2018. He knew the defendant from the antique shop in Cobden and would visit the shop with his girlfriend, H.G., his sister, D.P., and his cousins, C.F. and K.F. T.P. described the shop, including the back room that was a bedroom that the boys were not allowed to enter. T.P. stated he had seen the defendant touch H.G. two times. The first time the defendant was "roughhousing, wrestling, whatever you want to call it, and he attempted to, I believe, pick [H.G.] up and cupped his hands around her breasts from behind." The second time was at a swimming hole called Kaolin Pit. He testified that H.G. "was on [the defendant's] shoulders, and he put his hands on her thighs, just about as close as he could to her." T.P. testified that the defendant did not like him, and he had seen the defendant give the girls gifts and cash, although the defendant never gave anything to him.

¶ 11    H.G. testified that she was 13 years old in June 2018. She explained the defendant was her neighbor and lived in the antique shop in front of her house. She would go to the shop "at least

5

every week, if not three times a week." She would go by herself, or with D.P., T.P., and sometimes with C.F. She described the shop, including the back room, stating it was "like a small apartment bedroom." She testified that she gave an interview at the CAC and said the defendant "was touching [them] inappropriately and also making suggestive comments to us." H.G. testified that the defendant had asked her to be his girlfriend a few times or why she could not be his girlfriend. The most recent time he asked was three days before she gave her statement to the CAC. H.G. testified that the defendant would rub her shoulders, grab her thighs, and often graze against her when walking by her in the store. She stated that sometimes he would place his hand on her inner thigh and rub it with his thumb. H.G. described gifts, snacks, and money the defendant would give her and that he had allowed her to keep her guinea pigs in his apartment. She testified that she went swimming with the defendant a couple of times, and once he asked why they could not wear each other's swimming suits.

¶ 12    Officer Adams testified that in June 2018, he was an officer with the Village of Cobden and was part of the defendant's investigation. Officer Adams was present during the defendant's interview, which was admitted into evidence and published to the trial court. In that interview, the defendant stated that H.G. was his best friend, and he believed he provided a safe place for her to hang out. The defendant discussed H.G. and T.P.'s relationship. He admitted to giving the children money and candy. He stated that H.G. wanted him to go out with her mother because she did not like her dad. He said H.G.'s mom "is not my type," and expressed his desire to be H.G.'s boyfriend if he was 13 or 14 years old.

¶ 13    Defense counsel admitted a written statement from C.F., a written statement from H.G., and the forensic interview summary created by the CAC. The defendant then elected to testify on his own behalf.

6

¶ 14    The defendant testified that in June 2018, he worked at Wine Trail Antiques and lived in the back part of the store. He stated that H.G. was his friend and she came to the antique shop often. She had been coming to the store for about two years, and he had given her items from the store and money. He denied touching H.G.'s, D.P.'s, or C.F.'s breasts or buttocks. He stated that he had consoled C.F. one time about an incident with her father and that his hands were on her shoulders. He gave her money for candy, and she left. The defendant admitted he had kissed H.G. on the forehead but denied kissing her on the cheek. He continued to deny touching H.G.'s breast but stated that he might have touched her thighs when she jumped on his back. The defendant described T.P. as "rude, foul mothed, aggressive, selfish, [and] self-centered," and explained an incident where T.P. was being rude to H.G. The defendant testified that he stepped in and when he did, H.G. called him a bully. He told the trial court that when she said that to him, "all the air just went out of [his] body. And I just turned around and left." When asked about D.P.'s necklace, he stated that D.P. handed him the necklace when he asked her about it, and he never touched her breast.

¶ 15    At the close of all of the evidence, defense counsel moved for a directed verdict, which was denied. After closing arguments, the trial court found the defendant guilty of all four counts of aggravated criminal sexual abuse. The defendant's motion for a new trial was denied. On May 24, 2023, the court sentenced the defendant to 48 months' probation, which included a condition prohibiting the defendant from accessing social media. The defendant then filed a timely appeal.

¶ 16                                 II. ANALYSIS

¶ 17                          1. The Sufficiency of the Evidence

¶ 18    In reviewing a challenge to a claim of sufficiency of the evidence, the reviewing court views the evidence in the light most favorable to the State. *People v. Pollard*, 2015 IL App (3d)

7

130467, ¶ 26. As the reviewing court does not retry a defendant, all determinations regarding witness credibility and the weight given to the testimony are the responsibility of the trier of fact, not that of the reviewing court. *Pollard*, 2015 IL App (3d) 130467, ¶ 26. A defendant's conviction will only be reversed if the evidence is so improbable, unsatisfactory, or inconclusive as to leave reasonable doubt of defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 19 Here, all four victims testified consistently with their interviews from the CAC. They described the antique shop and the back bedroom, gifts the defendant gave them over the course of two years, and detailed accounts of the defendant's inappropriate behavior. The three girls verbally described the touching of their breasts and buttocks and physically demonstrated it to the trial court. Although the defendant denied the allegations, he admitted to kissing H.G. on the forehead and "consoling" the children without their parents' knowledge. He relayed a conversation with D.P. about "dick pics" on her phone. During his police interview, the defendant stated H.G.'s mom was "not his type" and expressed his interest in being H.G.'s boyfriend, if he was 13 or 14 years old. During the hearing on the defendant's motion for new trial, the trial court stated:

> "I found, frankly, the testimony of the victims in this case to be quite compelling. At some points, chilling to the court. And what I think is lost in this case was a narrative that appears to make this appear like normal conduct and a normal peer relationship. And this was—I believe it was a 49-year-old man spending an awful lot of time around 11- and 13-year-old girls with direct testimony of inappropriate conduct with those girls. And I believe the evidence is sufficient."

¶ 20 An element of the offenses for which the defendant was charged with included the language "for the purposes of sexual gratification or arousal of the defendant." The defendant appears to argue that because none of the victims testified that they personally viewed or felt the defendant's

8

erection, the State therefore failed to prove this element of the charged offenses. This argument is meritless, because "[a] defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act." *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010). Based upon our review of the entire record, we find the evidence was not so improbable, unsatisfactory, or inconclusive as to leave reasonable doubt of defendant's guilt.

¶ 21                                    2. The Jury Waiver

¶ 22    The defendant next argues his jury waiver was invalid because it was filed before the State completed discovery and a change in trial judge. First, the defendant fails to cite any discovery produced after his jury waiver that would have had any impact on his ability to execute a knowing and voluntary waiver. The change in judge is irrelevant because the defendant was admonished that a different judge could preside over his trial.

¶ 23    Next, the defendant contends that the trial court erroneously admonished him that his jury waiver was irreversible and therefore "thwarted his ability to make a knowing, understanding, and voluntary decision about his jury waiver." The Illinois Supreme Court has explained that once a defendant voluntarily elects to waive his right to a jury trial, "he cannot thereafter withdraw his waiver *as a matter of right*." (Emphasis added.) *People v. Catalano*, 29 Ill. 2d 197, 202 (1963). We interpret the trial court's admonishment to mean that the defendant could not simply "change his mind." A trial court can permit a defendant to withdraw his jury trial waiver if the circumstances show that the defendant did not understand the consequences of his waiver. *Catalano*, 29 Ill. 2d at 202. The defendant fails to cite anything in the record to establish that he wished to withdraw his jury waiver. The defendant suggests that because the trial court failed to admonish him that he could withdraw his jury waiver under proper circumstances, it therefore rendered his waiver involuntary. The defendant fails to cite to, and we fail to find, any case that so

9

requires. We decline to be the first. Therefore, we find the defendant's jury trial waiver was knowingly and voluntarily made.

¶ 24                          3. Probation Condition

¶ 25     The trial court imposed a probation condition that the defendant would be prohibited from having "social media presence, meaning Facebook, TikTok, Instagram, Snapchat, and things of that like." Section 5-6-3(a)(8.9) of the Unified Code of Corrections allows a trial court to impose a probation condition on a defendant convicted of a sex offense as defined in the Sex Offender Registration Act to refrain from accessing or using a social-networking website. 730 ILCS 5/5-6-3(a)(8.9) (West 2016). The defendant argues that the trial court's probation condition is a blanket ban on social-networking websites and should be vacated as violative of the defendant's first amendment rights. The State concedes this argument based upon the Illinois Supreme Court decision in *People v. Morgan*, 2019 IL 123643. The State acknowledges that there was no evidence that the defendant used social media websites, or the internet in general, as a means to commit the offenses for which he was convicted. Accordingly, we vacate the trial court's probation condition which banned the defendant from access to all social-networking websites.

¶ 26                          III. CONCLUSION

¶ 27     For the foregoing reasons, we affirm the defendant's convictions and vacate the probation condition barring the defendant from access to social media websites.


¶ 28     Affirmed in part and vacated in part.

10