# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Weeks*, 2012 IL App (1st) 102613

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRENDA WEEKS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2613 |
| Opinion filed | March 30, 2012 |
| Rehearing denied | April 27, 2012 |
| Modified Opinion filed | May 4, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder based on her beating and asphyxiation of her nephew, a 14-year-old paraplegic, was upheld where the evidence, viewed in the light most favorable to the State, could allow a rational trier of fact to find defendant guilty of first degree murder rather than involuntary manslaughter. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-12105; the Hon. Angela Munari Petrone, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Brian A. McNeil, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion. |
| | Presiding Justice R. Gordon and Justice Lampkin concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a bench trial, defendant Brenda Weeks was found guilty of the first degree murder of her nephew Joshua Cole and sentenced to 26 years in prison. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that she knew that it was practically certain her actions would cause the victim death or great bodily harm. We affirm.

¶ 2    At trial, Leon Adams testified on behalf of the State that he was engaged to defendant's daughter, Crystal Weeks, as of April 27, 2006. Crystal lived at defendant's house at 11935 South Yale Avenue in Chicago. The victim, a 14-year-old paraplegic, also lived with defendant because his mother, defendant's sister, had died.

¶ 3    On April 27, 2006, Adams arrived at defendant's home around 7:30 or 8:30 a.m. The victim was not there at that time. At the home, Adams found a bottle of urine and gave it to defendant, who seemed to be "a little upset about it." Around 3:30 p.m., the victim returned home from school, left his wheelchair on the first floor and crawled up the stairs to the second floor of the apartment. About 5 to 10 minutes later, defendant confronted the victim about the urine bottle and seemed "a little bit upset." Adams could not remember if the victim was complaining about chest pains that day, but he had heard the victim complain about chest pains more than once in the six months before April 2006.

¶ 4    Around 4:10 p.m., Adams went to the bathroom to shave and heard defendant whipping the victim with a belt. Adams heard the whipping sound 3 to 10 times. He could hear the victim crying but never saw defendant hit the victim. The whipping sounds went on for a couple of minutes, but the crying went on longer than that.

¶ 5    When Adams came out of the bathroom, he saw defendant in her room holding a white belt, Crystal in her room and the victim sobbing in the living room by the couch. Adams had heard defendant beating the victim once before, a couple of weeks before the incident. The victim then crawled up the stairs to empty out the urine bottle in the washroom and was not crying at the time.

¶ 6      Adams left the apartment between 7 p.m. and 8 p.m. Adams saw the victim sleeping on the living room floor before he left. Adams could tell the victim was sleeping because he was snoring.

¶ 7      Adams testified he returned to the apartment sometime after 8 p.m. The victim was lying in the same place he was before Adams left. Adams and Crystal went to check on the victim and called 911 after he failed to respond. The police instructed Adams to perform cardiopulmonary resuscitation (CPR), so Adams moved the victim from the living room to Crystal's room. Defendant and Adams performed CPR on the victim. Adams said defendant was "very upset" that the victim was not responding. The paramedics arrived and took the victim to the hospital.

¶ 8      The next day, Adams went to the police station and spoke to an unknown assistant State's Attorney. Adams told the State's Attorney that defendant often whipped the victim with the same white belt.

¶ 9      Guido Calcagno, a paramedic, testified that he responded to the emergency call from defendant's apartment at approximately 8:47 p.m. on April 27, 2006. He found the victim in or near a doorway to a bedroom where other paramedics were already providing advanced life support care, CPR and intubation. The victim had no pulse, so the paramedics transported him to the hospital.

¶ 10     Dr. Joseph Lawrence Cogan, a forensic pathologist, testified that he worked for the Cook County medical examiner's office as an assistant medical examiner. Cogan examined the victim's body and observed numerous injuries, including a scar on the victim's chest and abdomen, external deformities of the ribs, hyperpigmentation and excoriation over the skin of the right buttocks, lacerations of the upper and lower lip, abrasions of the nose and chin area and other numerous marks on the victim's body. Some of the injuries were recent and hemorrhaging, while some were old and had scarred. There were loop and parallel marks all over the victim's body, especially on his back. The marks ranged from recent to years old, with the most recent being less than 24 hours old. Cogan saw "too many injuries to count."

¶ 11     A variety of injuries on the victim's body were consistent with strangulation or suffocation. These included hemorrhaging deep in the victim's neck, which indicated that the neck had been compressed, most likely by suffocation or chokehold strangulation. There was also hemorrhaging at the front and base of the tongue, which was indicative of a suffocation injury. Cogan observed that the victim's blood was fluid and unclotted, which was evidence of asphyxiation. The asphyxiation would have killed the victim.

¶ 12     The victim's heart was "very large" and "very abnormal." It had a pacemaker and weighed over 700 grams, where a normal teenager's heart should weigh about 250 grams. The victim suffered from congestive heart failure and congenital heart disease, which could put a person at risk of sudden death. The scar on the victim's chest indicated he had had cardiac surgery. Cogan said that the victim being struck with a belt over days, weeks and months could have contributed to the weakening of his heart.

¶ 13     Cogan sent the heart to the Maurice Lab Congenital Heart and Conduction Systems Center in Palos Heights, where Dr. Saroja Bharati examined it. Bharati found that the pacemaker's lead wires were damaged and its batteries were dying. The pacemaker cut down

some of its functions to preserve energy, since it was entering the end of its service life.

¶ 14    Cogan concluded that the loop and parallel marks on the victim's body were consistent with being hit by a belt. The bruise on the victim's forehead resulted from blunt force trauma, and the skull hemorrhages were consistent with recently inflicted trauma. Cogan attributed the various injuries on the victim's head to "blows" that were inflicted with force greater than what could be exerted with a hand or fist. The abrasions on the right forearm were fresh and recent. Some of the marks on the lower abdomen and pelvis appeared to be older while some appeared more recent.

¶ 15    Cogan concluded that the victim "died as a consequence of multiple injuries due to an assault" and that the manner of death was homicide. The victim's multiple injuries included: asphyxiation; multiple abrasions and contusions on the head, torso and extremities; congestive heart failure; and congenital heart disease. The stress related to these injuries also caused a gastrointestinal hemorrhage. Cogan testified that the victim most likely died as a result of being suffocated or placed in a chokehold. Cogan identified in court a total of at least 176 injuries on the victim's body. About 93 of them appeared to have been inflicted within the last 24 hours.

¶ 16    On cross-examination, Cogan testified that the head injuries alone would not have proven fatal. He said that it was unlikely that the victim's mouth injuries could have resulted from an inexperienced person attempting to perform CPR. Finally, Cogan said that the victim sitting in urine-soaked underwear might have caused some of the skin to break down.

¶ 17    Detective Oscar Arteaga testified that he was assigned to investigate the victim's death. Arteaga observed the victim's body at the hospital and saw bruising on its biceps and back, in addition to loop marks on the back. Arteaga spoke with defendant at the hospital. She was calm and cooperative and not demonstrably upset, crying, hysterical or screaming. She said the victim had not complained about medical problems within the past year. She said she struck the victim with a belt because he urinated in the bed and that she had struck him in the past.

¶ 18    Crystal Weeks largely corroborated Leon Adams' testimony. Crystal testified that defendant was her mother, the victim was her cousin and she was living with them on the night of the incident. While Crystal and defendant were cleaning the house, defendant told Crystal that she found a 20-ounce pop bottle in which the victim had urinated. This seemed to upset defendant. Crystal said the victim urinated inappropriately almost every day, and defendant would punish him, either by taking away his toys or spanking him with a belt.

¶ 19    On April 27, 2006, the victim returned home from school around 4 p.m. and crawled up the stairs as he normally did. Defendant then confronted the victim about the pop bottle. The only people home at the time were defendant, the victim and Crystal. While in her room with the door closed, Crystal heard defendant spanking the victim. The spanking lasted two to three seconds, and she heard around four "little smacks."

¶ 20    Crystal admitted that on the night of the incident she told the police that Adams was in the bathroom taking a bath when the victim returned home from school. Crystal also told the police defendant "whooped" the victim every time he urinated, and on April 27, 2006, defendant beat the victim for more than 10 minutes. Crystal testified she told the police that

defendant "whooped" the victim for two to three minutes, but they "wrote it down wrong."

¶ 21    Crystal testified that when she came out of her room, she saw the victim going to the bathroom to pour out the urine. He was not crying at the time. Crystal admitted that she told the grand jury that the victim was still crying when he was emptying out the bottle in the bathroom. She asked him if he was "all right" and he said "yeah." She noticed he had a "couple of whips" on his arm. The victim told Crystal his chest was hurting, so she got him an ibuprofen, told him he did not have to do his chores and told him to lie down and get some rest. About 30 to 45 minutes after the spanking, the victim lay down on the floor by the couch. Crystal went back to her room and Leon Adams left the house.

¶ 22    Adams returned about an hour later, and he and Crystal went to check on the victim. They realized he was not breathing and his body was cold. Crystal and Adams dragged the victim's body to Crystal's room and tried to perform CPR. The victim was wheezing a little bit at this point. CPR was not working, so Crystal ran downstairs to alert her grandmother, who called an ambulance. Crystal and Adams both called 911. The police did not arrive for another 30 to 40 minutes. Crystal and Adams continued to perform CPR on the victim while they waited for the ambulance to arrive.

¶ 23    On cross-examination, Crystal testified that the victim had complained as soon as he got home that his chest was hurting and again after he poured the urine out.

¶ 24    Detective Patrick Smith testified that he viewed the autopsy report of the victim's body at the medical examiner's office. He saw bruises on the victim's legs, arms, back and buttocks. On April 27, 2006, Smith went with his partner, Lloyd Gray, to defendant's residence. On the first visit to defendant's home, they did not search the second floor. They asked Crystal Weeks and defendant's mother, Martha Weeks, to accompany them to the police station to be interviewed. Crystal signed a consent-to-search form during this interview. Smith did not see signs of a struggle or blood while searching the apartment. Smith searched defendant's room and recovered one white belt and three other belts from the bed. He also recovered from a night stand a card that contained a letter, defendant's driver's license and identification card. Defendant's identification cards indicated she was 5 feet 3 inches tall and weighed between 235 and 246 pounds. The letter on the night stand was dated April 27, 2006, addressed to "Andre" and signed by "Brinda." Crystal had testified that defendant was dating Andre during the time in question. The letter read:

"Dear Andre. How are you? [Fine], I hope. I received your card with the letters in it. Baby, yes, I do love you, so you should know that I will always be there for you no matter what.

I am listening to you when you say, don't get rid of Joshua, but, baby, this is really working my last nerve. Right as I was getting ready to write you this letter, I keep on smelling piss, and, lo and behold, my Joshua took where was a bowl and in my bowl is some piss. This piss ass boy done pissed in my bowl that we eat out of.

But, baby, this is not the first time he's piss in something. The other time he's pissed in a bottle of pop. Baby, he is not going to be with us when we get married and move. Over.

I don't know what to do anymore. Damn if I won't *** be cleaning behind another

child. I can still have one. He is not worth it. He is really working me. He is really making me ***.

* * *

[Defense objection sustained.]

He's getting more nasty by the minute. To make it even more worse, don't no one in the family want him. Baby, I have tried everything to get him to act right. It's like the more I try, the more he rebel.

My mother tells me to give him to DCFS. If all else fails, I guess I will have to do it. Because I [refuse] to beat him all the time because I guess the beating don't even hurt him either.

I was trying to wait on you to see what you could do, because now I don't know what to do. I'm trying not to swear, but he makes me do it more and more every day.

He won't stop pissing. Man, I had to throw out *** all my furniture because he piss it up. Please help me and tell me what I should do with the little b***.

* * *

Baby he comes home from school [illegible] with piss every day. When he gets off the bus, he smells like d*** and p*** and always with his pants down and open. When I asked why, he says, I don't know.

Baby, I'm truly f*** tired. This has been going on for the last four years. So you see I'm tired. I love him, but *** he will have to go.

***

And he's 14 years old and about to be 15 in November. But when Willie is here, he don't do none of it. ***

I know I promised Linda that I would take care of him, but now I don't think so. Baby, just talking about it is pissing me the f*** off, so now I have to go watch this piss b*** get off the bus, but I will be writing you back very soon. Love. Love always, Brinda, B-r-I-n-d-a."

¶ 25    Assistant State's Attorney John Maher testified that at about 11 p.m. on April 28, 2006, Maher had a conversation with Crystal. Detectives Smith and Gray were present for part of the conversation. Maher memorialized the conversation by writing down Crystal's responses. Crystal reviewed the statement, made one change to the document, and she, Gray and Maher signed it. Maher read the following from the statement:

"Crystal states that her mom, Brenda, started screaming at Joshua about peeing in the bottle. Joshua was crying and saying he was sorry while Brenda whooped with the white belt. Crystal states she could hear the belt hitting Joshua.

Crystal states that Brenda beat Joshua for a long time, more than ten minutes long. Crystal came out of her room and saw Brenda with the white belt."

¶ 26    On cross-examination, Maher read another part of the statement that said "Crystal states that her mom, Debra Weeks, was on the second floor with Joshua, who had crawled up to the second floor using his arms." Maher testified that using Debra rather than Brenda was

his error, but Crystal did not correct him.

¶ 27    Dr. Bharati testified on behalf of the defense. She examined the victim's heart on May 19, 2006. The victim's heart was abnormal, with the right ventricle located where the left ventricle should have been. The right ventricle was enlarged and eventually failed. The pulmonary valve was arthritic and had not developed.

¶ 28    There was evidence of surgical intervention on the atrium and left ventricle. The victim had previously undergone a procedure to allow blood to flow to his lungs. The victim underwent a second surgery, where a conduit was placed in the heart to connect the right ventricle to two pulmonary arteries. This conduit became nonfunctional, so the victim had a third surgery to replace the conduit. The victim had a large amount of scar tissue in his heart, leading the heart to function abnormally. Bharati said a heart can only hypertrophy, or grow, three times its normal size before heart failure would occur. The victim's heart was 729 grams, while an average 14-year-old heart is 130 to 150 grams. Additionally, a large quantity of fat tissue covered the heart and affected the conduction system. An abnormally large heart, on its own, could result in death. Also, the scar tissue in the ventricles could lead to ventricular tachycardia, fibrillations and sudden death.

¶ 29    Bharati did not know how long the victim had been living with an enlarged heart. She testified that she believed that the victim's heart conditions probably resulted in his death because people with these types of heart problems are more "vulnerable."

¶ 30    No further evidence was presented.

¶ 31    The court found defendant guilty of first degree murder and sentenced her to 26 years in prison. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that she knew it was practically certain her actions would cause the victim death or great bodily harm.

¶ 32    The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272, 891 N.E.2d 865 (2008). It is not the function of the reviewing court to retry the defendant or substitute its judgment for that of the trier of fact. *People v. Collins*, 214 Ill. 2d 206, 217, 824 N.E.2d 262 (2005). The trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. *People v. Naylor*, 229 Ill. 2d 584, 614, 893 N.E.2d 653 (2008). The trier of fact is not required to disregard inferences that flow from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. McDonald*, 168 Ill. 2d 420, 447, 660 N.E.2d 832 (1995). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225, 920 N.E.2d 233 (2009).

¶ 33    A defendant is guilty of first degree murder when she kills a person without lawful justification and knows her acts created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2006); *People v. DiVincenzo*, 183 Ill. 2d 239, 249-50, 700 N.E.2d 981 (1998). A defendant is guilty of involuntary manslaughter when she

unintentionally kills a person without lawful justification by recklessly performing acts that are likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2006); *DiVincenzo*, 183 Ill. 2d at 250.

¶ 34    The difference between involuntary manslaughter and murder is the mental state that accompanies the conduct resulting in the victim's death. *DiVincenzo*, 183 Ill. 2d at 249. "The mental state for murder is knowledge, while the mental state for involuntary manslaughter is recklessness." *People v. Jones*, 404 Ill. App. 3d 734, 742, 936 N.E.2d 1160 (2010). A person has knowledge when she is consciously aware that her conduct is practically certain to cause a particular result. 720 ILCS 5/4-5(b) (West 2006). A person acts recklessly when she consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care a reasonable person would exercise in the situation. 720 ILCS 5/4-6 (West 2006). A person acts recklessly even where death or great bodily harm is not substantially certain to occur. *DiVincenzo*, 183 Ill. 2d at 250.

¶ 35    The requisite mental state may be inferred from the character of the defendant's acts and the circumstances surrounding the commission of the offense. *People v. Tye*, 141 Ill. 2d 1, 15, 565 N.E.2d 931 (1990). Factors to consider in determining whether one acted knowingly or recklessly include: (1) the disparity in size and strength between the defendant and the victim; (2) the brutality and duration of the beating; (3) the severity of the victim's injuries; and (4) whether the defendant used her bare fists or a weapon. *DiVincenzo*, 183 Ill. 2d at 251. The nature of the killing, shown by either multiple wounds or the victim's defenselessness, may demonstrate the absence of recklessness. *DiVincenzo*, 183 Ill. 2d at 251.

¶ 36    Here, we find that a rational trier of fact could have found defendant guilty of first degree murder rather than involuntary manslaughter because the evidence shows she knew the beating she inflicted on the victim would result in death or great bodily harm. The disparity in size and strength between the victim and defendant is the first factor supporting a first degree murder conviction. Defendant was 5 feet 3 inches tall and weighed between 235 and 246 pounds. The victim was a 14-year-old wheelchair-bound paraplegic with multiple health issues, including congenital heart disease, congestive heart failure and a severe bladder infection. See *Tye*, 141 Ill. 2d at 15-16 ("[d]isparity in size and strength between the defendant and the victim *** are relevant circumstances in ascertaining whether the defendant possessed the necessary mental state"). Detective Smith did not find evidence of a struggle in the apartment, which evidences the victim's helplessness and the power imbalance between defendant and the victim.

¶ 37    The severity of the injuries on the victim's body also supports a first degree murder conviction. Dr. Cogan testified several times that there were "too many injuries to count." There was extensive hemorrhaging throughout the victim's body, including the larynx, scalp, lips, head and bladder. The scars on the victim's back, legs, arms, buttocks and head, many of which were fresh, were consistent with a belt beating. Crystal told the police on the night of the murder that the beating went on for over 10 minutes, with the victim crying and apologizing during it.

¶ 38    Defendant contends that the injuries resulting from the beating did not rise to the level

of great bodily harm, citing *In re T.G.*, 285 Ill. App. 3d 838, 846, 674 N.E.2d 919 (1996). There the court found the great bodily harm element of the offense of aggravated battery was not proven beyond a reasonable doubt because the victim did not realize that he had been hit or that he was bleeding and one of the knife wounds he suffered felt like being " 'poked with a pen or a pencil.' " *T.G.*, 285 Ill. App. 3d at 846. Defendant's reliance on *T.G.* ignores the nature and extent of the injuries inflicted upon the victim here. The signs of asphyxiation and the victim's 93 recent injuries, including lacerations, hemorrhages and contusions, strongly evidence great bodily harm, rather than ordinary bodily harm. Additionally, the victim's crying shows that he was aware of the severity of the beating, unlike the victim in *T.G.*

¶ 39    The method of the beating supports a first degree murder conviction. Although defendant did not use an inherently dangerous weapon, we have previously held that belts can cause great bodily harm. See *People v. Brown*, 199 Ill. App. 3d 860, 874, 557 N.E.2d 611 (1990). Here there is no dispute that defendant used a belt to beat the victim.

¶ 40    In addition to the blunt trauma injuries as noted above, the victim's body showed evidence of asphyxiation. Although no one witnessed defendant applying a chokehold or other suffocation technique on the victim, there was sufficient circumstantial evidence to show that defendant was responsible for the asphyxiation injuries. Circumstantial evidence is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Sutherland*, 223 Ill. 2d 187, 242-43, 860 N.E.2d 178 (2006). Defendant, Crystal and Adams were the only people in the apartment during the beating, defendant was the only one who punished the victim during this period, and Cogan testified that the asphyxiation injuries were recent. It is reasonable to conclude that defendant asphyxiated the victim.

¶ 41    Finally, defendant's letter to her boyfriend suggests that she wanted to be permanently relieved of the burden brought on by the victim. She emphasized her frustration and stated that he would "have to go" because she did not want the victim to "be with us when we get married and move." The letter indicates that defendant's frustration was escalating, because she stated that the victim was "getting more nasty by the minute" and she had tried "everything to get him to act right."

¶ 42    Defendant contends *People v. Brooks*, 115 Ill. 2d 510, 505 N.E.2d 336 (1987), *overruled on other grounds by People v. R.D.*, 155 Ill. 2d 122, 613 N.E.2d 706 (1993), supports her claim that her actions were reckless rather than knowing. In *Brooks*, the defendant punished her baby by giving him a mixture of salt, pepper and water. The baby died from the ingestion of the salt solution, and the defendant was convicted of involuntary manslaughter. On appeal, the supreme court upheld the defendant's conviction, finding that although death was not the necessary consequence of the punishment, the act of forcing the child to ingest the salt solution was reckless and likely to cause death or great bodily harm. *Brooks*, 115 Ill. 2d at 523.

¶ 43    We find *Brooks* distinguishable because the defendant there was convicted of involuntary manslaughter, there was an isolated instance of abuse and the *Brooks* court never addressed the issue of whether the defendant's action could rise to the level of first degree murder. The numerosity and severity of the victim's injuries here demonstrate that defendant had

knowledge that her actions would cause death or great bodily harm to the victim.

¶ 44     We hold that the evidence shows the beating and asphyxiation of this 14-year-old victim were probably certain to result in great bodily harm or death. A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found defendant guilty of first degree murder.

¶ 45     Defendant's conviction for first degree murder is affirmed.

¶ 46     Affirmed.