**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200371-U

Order filed November 29, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0371 Circuit No. 19-CF-216 |
| | ) | |
| JATARA N. JOHNSON, | ) ) | The Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Hettel and Peterson concurred in the judgment.

_____
_____

**ORDER**

¶ 1    *Held*:   In an appeal in a criminal case in which defendant was convicted of first degree murder and aggravated battery, the appellate court found that defendant was proven guilty beyond a reasonable doubt of first degree murder (defendant did not challenge her aggravated battery conviction).  The appellate court, therefore, affirmed the trial court's judgment.

¶ 2    After a bench trial, defendant, Jatara N. Johnson, was convicted of first degree murder

(720 ILCS 5/9-1(a)(2) (West 2018)) and aggravated battery (720 ILCS 5/12-3.05(f)(1) (West

2018)) and was sentenced to consecutive prison terms of 28 years and 2 years, respectively.

Defendant appeals, arguing that the State failed to prove her guilty beyond a reasonable doubt of first degree murder. We affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4        On April 11, 2019, 20-year-old Charee Alexander was stabbed four times, including once in the neck, during a large fight at Schmoeger Park in Peoria, Illinois. Another person at the fight, John Hill, Charee's cousin, was stabbed once in the shoulder. Charee died the following day from the injury to her neck. John suffered only a minor injury. Defendant was subsequently arrested and charged with first degree murder for the stabbing of Charee and aggravated battery for the stabbing of John. The weapon that was allegedly used to commit the offenses was never found.

¶ 5        In June and July 2020, defendant's case proceeded to a bench trial. The trial took three days to complete.[1] During the evidence phase of the trial, several witnesses were called to testify. In addition, numerous exhibits were admitted into evidence, including cell phone videos that were filmed during the fight, screenshot photographs from those videos, a cell phone video that was recorded by the police of a live video stream that defendant's brother had uploaded to Facebook after the fight, photographs of some blood drops that the police had discovered in the driveway and on the road in front of a house across from the park, some of the autopsy photographs, a photograph of John Hill's stab wound, and the recorded police interview of defendant's brother.

¶ 6        Many of the facts surrounding the fight at the park and the stabbings were not in dispute. As to those facts, the evidence presented at the bench trial established that on April 11, 2019,

_____

[1] The evidence was presented on the first day of the bench trial, the closing arguments were made on the second day, and the trial court made its ruling on the third day.

2

around 4:20 p.m., a large group of people gathered at Schmoeger Park in Peoria to watch Alexis Reeser and Shatiya Alexander fight. The group at the park was divided into two different factions—one that supported Alexis and the other that supported Shatiya. Each faction went to the park to make sure that the other faction did not join in the fight. The victims in this case, Charee (Shatiya's sister) and John (Shatiya's cousin), were in Shatiya's faction, and defendant was in Alexis's faction.

¶ 7      While at the park, Alexis and Shatiya fought approximately three times. Portions of each of those fights were captured on cell phone videos. After the second fight, when it appeared that the entire confrontation was over and people were heading toward their cars to leave, defendant's brother, Jacolby Carlton, pulled up. Everything got chaotic after that point. Alexis and Shatiya started fighting again, and people in both factions started to fight as well. During that third fight, the two victims were stabbed. Charee was rushed to the hospital but died the following day.

¶ 8      The main issues at defendant's bench trial were: (1) whether defendant was the person who had stabbed or cut the victims; (2) if defendant was that person, whether she had done so with a knife or with her broken cell phone; and (3) if defendant had stabbed or cut the victims with her broken cell phone, whether she was guilty of the charged offenses (argued more implicitly and suggested through some of the evidence presented). On those issues, the underlying facts were in dispute. The State presented witness testimony to try to establish that defendant had knowingly stabbed the victims with a knife. The testimony of those witnesses in that regard can be summarized as follows.

¶ 9      Sherrce Abbey testified for the State that she was the mother of Shatiya Alexander, Charee Alexander (the murder victim), and Carlos Zollicoffer and that she was present at the park for the fight that day. According to Sherrce, Shatiya wanted to go to the park and fight the

other girl, Alexis, one-on-one, to get the fight over with because Alexis had been bringing four or five girls to Shatiya's work and had been trying to fight Shatiya there.[2] Prior to going to the park, a group of Shatiya's family and friends met at Sherrce's mother's house. When Shatiya, Sherrce, and the others got to the park, Shatiya and Alexis started fighting immediately. The two girls fought multiple times one-on-one without other people joining in the fight.

¶ 10    After the second fight, as Shatiya and Sherrce were pulling away and everyone was starting to leave, a red or burgundy car (the red car) pulled up, and Sherrce heard defendant start screaming that her brother (Jacolby Carlton) was here and a whole bunch of other stuff. Sherrce did not know who defendant was at that time and had never seen defendant before. Defendant's brother, Jacolby, jumped out of the red car and started running toward one of Charee's friends, Jashae Zollicoffer, as Jashae was walking back to his own car. Sherrce told Shatiya to stop the car because Sherrce thought that Jacolby was going to do something to Jashae. Jacolby ran up to a white car that Sherrce's son, Carlos, was in and tried to hit Carlos through the window.

¶ 11    Shatiya stopped the car, and Sherrce jumped out to try to stop Jacolby from fighting Carlos because Carlos was only 17 at the time. As Sherrce started to do so, she saw Charee, who was running over to where Carlos was located, fall down and then get back up. Before Sherrce could get over to Carlos, however, she had to go back to her own car because all of the other girls had returned to her car and had started fighting with Shatiya again. There were several people in the park fighting at that time. Sherrce did not see what happened to Charee or where

_____

[2] Although some of the witnesses in this case did not know the names of some of the other people who were present at, or involved in, the fight, we have referred to those other people by name in our presentation of the witnesses' testimony here, when possible, to avoid any confusion.

4

Charee went after that point. Sherrce also did not see Charee holding a baseball bat at any time while the incident at the park was unfolding.[3]

¶ 12        Sherrce ran over to where Jacolby and Carlos were located and got between them to stop them from fighting. Sherrce told Jacolby that Carlos was her son and that he was a baby. Defendant ran over to Jacolby from behind with a knife in her hand (Sherrce thought the knife was in defendant's left hand) and put her arms on or around Jacolby. That was the first time that Sherrce had seen defendant. Sherrce did not see any blood on the knife at that time and left the park shortly thereafter.

¶ 13        Johnashia Hill testified for the State that she was Charee's cousin and Sherrce's niece and that John Hill was her brother. On the day of the fight, Johnashia went to the park with the other members of Shatiya's group. After the second fight between Shatiya and Alexis was over and everyone was getting ready to leave, defendant's brother, Jacolby, arrived. Johnashia did not hear defendant say anything at that time, but it was loud at the park. Jacolby got out of his car, ran over to Carlos's car, and hit or tried to hit Carlos through the window. Carlos and John got out of Carlos's car and started fighting with Jacolby, and a lot of the other people at the park started fighting as well. That was when the third fight occurred between Shatiya and Alexis.

¶ 14        During the third fight, Johnashia ran over to where everyone else was fighting. Charee was behind Johnashia at that time. Defendant tried to stab Johnashia with a knife, but Johnashia stepped back, and defendant was only able to nick Johnashia. After doing so, defendant ran over to where Shatiya and Alexis were fighting and tried to stab Shatiya in the head with the knife while Shatiya was on the ground. Defendant then went over toward Charee and stabbed Charee

_____

[3] Defendant did not claim self-defense. The testimony about Charee having a bat at some point during the fight is only presented here to give an accurate statement of the facts.

in the neck with the knife. Johnashia only saw defendant stab Charee one time. Charee ran off. Defendant ran over to where John and Jacolby were fighting and stabbed John in the shoulder with the knife. All of the that happened in a matter of seconds.

¶ 15   Johnashia did not see defendant holding a knife during the first or second fights and initially stated in her testimony that she did not know where defendant had gotten the knife. However, when Johnashia was asked further about the matter later in her testimony, she stated that when defendant's brother, Jacolby, pulled up, defendant went into Jacolby's car and took the knife out from under one of the seats and put it behind her back. The knife looked like a kitchen knife. Johnashia did not know whether there was any "bad blood" between defendant and Charee. Johnashia denied that she had any type of a weapon during the fight but acknowledged that Charee had a baseball bat at one point when the fight was occurring. Johnashia stated, though, that Charee had dropped the bat before Charee was stabbed by defendant.

¶ 16   Johnashia also acknowledged during her testimony that shortly after the incident occurred, she told the police that she thought that Charee had gotten stabbed while Charee was getting into a car. Johnashia stated on the witness stand, however, that what she had stated to the police was not what had actually occurred at the park and that she was overwhelmed and upset when she spoke to the police. Johnashia indicated further on the witness stand that everything was clear to her now and that "everybody" had helped her clarify things in her mind.

¶ 17   Upon being shown all or a portion of the cell phone video of the third fight between Shatiya and Alexis, Johnashia was able during her testimony to identify herself, John, Charee, Cinese Summerville (a friend of Charee), Jashae, defendant, and Jacolby in the video. Johnashia stated that the item in defendant's hand in the video was a knife and also pointed out the moment in the video when defendant nicked her with the knife. Johnashia identified a still image from

6

that video as a photograph that showed when defendant had tried to stab Johnashia. According to Johnashia, defendant still had the item in her hand in that photograph.

¶ 18    John Hill testified for the State that he was Johnashia's brother and was 16 years old at the time of the fight. John rode to the park with his cousin, Carlos (Shatiya and Charee's brother). After everyone arrived at the park, Shatiya and Alexis fought a few times. At some point, when Shatiya and Alexis were done fighting and John was getting ready to leave, a red car pulled up that was being driven by defendant's brother, Jacolby. While John was seated in the back of Carlos's car, he saw an arm swing through the driver's side window at Carlos. John and Carlos got out of the car, and John started fighting with Jacolby (presumably, the person who had swung through the window at Carlos). There was a lot of stuff going on at the park at that point, and there were a lot of people—more than 10—at the park.

¶ 19    When John had just finished fighting Jacolby, he felt a poke in his arm from behind and saw that there was blood coming down his arm. John turned around and saw that defendant was standing behind him and that defendant was the person who had stabbed him in the arm. Everyone walked away at that point. John got back in the car and left with Carlos. They were eventually stopped by the police, and John told the officer that he had been stabbed. An ambulance was called, and John was taken to the hospital.

¶ 20    Cinese Summerville testified for the State that Charee had been her best friend for several years and that she knew some of the other members of Charee's family. Cinese rode to the park on the day of the fight in Jashae Zollicoffer's black car with Jashae and Charee. When Jashae, Charee, and Cinese got to that location, Jashae parked his car a little ways down from the park. As Cinese and the others walked up to the park, everyone else was either almost there or just pulling up.

¶ 21    While at the park, Shatiya and Alexis fought multiple times. After the fight between Alexis and Shatiya seemed to be over and Cinese and the others were walking back to Jashae's car, Jacolby, defendant's brother, pulled up. Cinese knew who Jacolby and defendant were but did not know them personally. Cinese heard defendant, who was already at the park, scream excitedly that this was the person for whom she had been waiting. Jacolby jumped out of the car, went over to Carlos's car, and punched Carlos through the window. Things got chaotic at that point, and everyone on both sides started fighting.

¶ 22    Defendant ran toward the area where Jacolby was located. Charee, Jashae, and Cinese, who had been walking back to Jashae's car, started running back toward the park. Keambra Nunn, who was standing by one of the trees in the park, tried to hit Cinese with a baseball bat. Cinese backed away. Cinese saw defendant swinging a knife and trying to stab Shatiya. The knife was silver with a black handle and looked like a small kitchen knife—it was pointy and was sharper than a butter knife but was not as big as a butcher knife. At about that same time (Cinese was not sure which thing happened first), Cinese heard Charee and Jashae screaming so she ran back to where they were located. Charee and Jashae were in shock. Charee had a stab wound to her neck and was bleeding profusely. Jashae was holding Charee's neck and trying to stop the bleeding with his jacket or shirt. Cinese had not seen Charee get stabbed.

¶ 23    Cinese grabbed Charee and started running Charee to Jashae's car. They put Charee in the back of the car and left for the hospital. Charee called her boyfriend on the phone and told him that she was "feeling to die." Cinese did not want Charee talking like that so she took the phone away from Charee. While Jashae was trying to drive to the hospital, the police kept cutting him off because the police thought that Jashae and the others were trying to leave the fight. Jashae stopped at a gas station where an ambulance was parked nearby.

8

¶ 24        Upon being asked again about the matter, Cinese confirmed during her testimony that she did not see defendant stab Charee. Cinese also acknowledged in her testimony that when a uniformed police officer approached her at the gas station and asked her what had happened, she told the officer that she did not know. Cinese stated on the witness stand, however, that she told the officer that because she was in shock and because she just wanted to get to the hospital.

¶ 25        During her testimony, Cinese was shown the cell phone video of the third fight. After watching all or a portion of the recording, Cinese was able to identify in the video several of the people who were involved in the fight at the park, including herself, Charee, Johnashia, defendant, and Keambra. According to Cinese, Charee had a baseball bat in her hands when Charee and the others walked up to the park but did not have the bat when she was stabbed by defendant. Keambra had the bat at that time.

¶ 26        Jashae Zollicoffer testified for the State that he was very close to Charee and Cinese and to Charee's family. Upon arriving at the park on the day of the fight, Jashae parked his car about a block away, and he, Charee, and Cinese walked to the park. Charee had a baseball bat in her hands at the time. The three of them brought the bat to the park just in case. Charee did not swing the bat at anyone. A big group was forming at the park. Shatiya and Alexis started fighting and fought multiple times. No one else joined in those fights. Jashae knew who defendant and her brother, Jacolby, were and saw defendant at the park talking on her cell phone while Shatiya and Alexis were fighting.

¶ 27        When Shatiya and Alexis finished fighting and everything was dying down, Jashae, Charee, and Cinese walked back to Jashae's car. As they were just about to get into the car, Jacolby pulled up in a red car, stopped in the middle of the street next to Carlos's car, and jumped out. Defendant started "going crazy" and started saying stuff about her brother being

9

there now.  Defendant went over to Jacolby's car and reached inside the driver's side door, which was still open.  Jashae did not see if defendant took anything out of Jacolby's car because everyone started fighting and Jashae was not really watching defendant at that point.

¶ 28    Jacolby took a swing at Carlos, who was still seated in his own car.  Charee saw what had happened and started running back over to the park and toward the red car.  Jashae and Cinese followed.  By the time that Jashae got over to the park again, Charee was already running back to him.  Charee had her hand on her neck and said to Jashae "this b*** just stabbed me."  Jashae moved Charee's hand to see what she was talking about, and blood started gushing out the side of Charee's neck.  Jashae was in shock.  He grabbed Charee, and he and Cinese ran Charee to Jashae's car.  They put Charee in the backseat and headed for the hospital.  Jashae was driving, and Cinese was holding Charee's neck.  Charee was saying things to Jashae and Cinese, like "I'm feeling die" and "this b*** just stabbed me."  On the way to the hospital, Jashae pulled into a gas station because he knew that there was an ambulance parked nearby.  Charee was basically lifeless at that time.

¶ 29    During the incident at the park, Jashae did not see defendant with a knife.  However, when he was interviewed by the police at the hospital the next day, Jashae told the police that he did see defendant with a knife because he had watched a video that had been posted to Facebook, and, in the video, it looked like defendant had a knife.  When Jashae made the statement to the police about defendant having a knife, he meant to tell the police that in the video he had watched, it looked like defendant had a knife.  During the police interview, Jashae also described the knife to the police and how defendant was holding it.  On the witness stand, though, Jashae stated that what he told the police about the knife was based upon what he had seen in the

10

Facebook video. According to Jashae, he had watched the Facebook video at the hospital before he talked to the police.

¶ 30        Forensic Pathologist Dr. Amanda Youmans testified for the State that she performed an autopsy on Charee on April 15, 2019. Upon conducting an external examination of Charee's head and body, Youmans observed that Charee had four stab wounds: one on the left side of her neck, one on her face below her right eye, one on her right arm, and one on her right hand. The wounds were consistent with what Youmans had observed through her training and experience as to what a puncture or stab wound would look like. In addition, in Youmans's opinion, the wound to Charee's right hand was consistent with a defensive wound. Upon conducting an internal examination of Charee's head and body, Youmans observed that Charee had suffered a lethal injury to her left subclavian artery—a sharp weapon had nearly cut the artery in half. In Youmans's opinion, that was the injury (the stab wound to the neck) that caused Charee's death. Youmans had no opinion on whether all four of the wounds came from the same weapon, on the order in which the four wounds were inflicted, or on the amount of time it would have taken to inflict all four wounds.

¶ 31        Jacolby Carlton testified for the State that he was defendant's brother and that on the day of the fight, he went to the park after defendant called him and told him that she was fighting some female at the park and that some guys had put their hands on her. Jacolby did not have any type of weapon in his car at that time. When Jacolby arrived, there were more than 30 people at the park, and some of the people, including defendant, were fighting. About 12 of the people rushed Jacolby's car. Jacolby got out and started fighting as well. During the fight, Jacolby got hit with baseball bats and, at some point, got cut. Jacolby did not know who had cut him. There were weapons on both sides of the fight, and the other side had bats and knives. When the fight

11

was occurring, defendant never made it over to where Jacolby's car was located and never reached inside Jacolby's car. In addition, Jacolby never saw defendant with a knife or anything else in her hand at the park, other than her cell phone. According to Jacolby, it was possible that he had gotten cut by defendant's cell phone.

¶ 32        After the fight was over, Jacolby and defendant left the park in Jacolby's car and went to their mother's house. When they got there, Jacolby posted a video on Facebook. During his testimony, Jacolby denied that he had stated to defendant in that video that she had cut him. According to Jacolby, he had merely asked defendant in the video "who" had cut him.

¶ 33        A few days after the incident at the park, Jacolby was interviewed by the police. On the witness stand, Jacolby wavered back and forth as to whether he had told the police in that interview that defendant had accidentally cut him during the fight when she was swinging around whatever she had in her hand. At times during his testimony, Jacolby admitted making that statement to police; at other times, he denied it; and, at even other times still, he stated that he told the police he had been cut with something but not that defendant had cut him with something. Jacolby also stated during his testimony that he was familiar with some of the people on the other side of the fight and that he had previously dated Shatiya.

¶ 34        Peoria Police Officer Ryan Isonhart testified for the State that shortly after the fight had occurred, he got onto social media and started scrolling through it to see if he could find any videos of who was fighting or what had happened. According to Isonhart, usually after a fight had occurred, there would be several videos of that fight that would get posted online and would appear on his social media news feed. Upon checking social media, Isonhart found a video that was being streamed live to Facebook by Jacolby. During the live video, Jacolby and defendant were in a car. Jacolby had bloody clothes, was talking about having a cut on his arm, and made a

12

comment to defendant about her cutting him. Defendant said something about going to Chicago. Isonhart started recording the video with a work phone. During the recorded portion, after Jacolby and defendant arrived at their mother's house, got out of the car, and went into the house, Jacolby said something to defendant along the lines of, "you cut me when you was trying to stab dude."

¶ 35        Peoria Police Detective Seth Landwehr testified for the State that he was the lead detective in this case. As part of his investigation into the stabbings, Landwehr interviewed Jacolby Carlton. All or a portion of that interview was video recorded. During the interview, Jacolby acknowledged that he had stated on his Facebook live video that defendant had "cut [him] while [she] was trying to stick dude." Jacolby told Landwehr further that he did not even know during the fight that defendant had cut him while she was trying to help him. Jacolby stated further that he did not see defendant with a knife in her hand and that defendant was swinging her arms at the time. Jacolby acknowledged to Landwehr, however, that defendant had cut him with something and that defendant was using whatever she had in her hand as a weapon.

¶ 36        During his testimony, Landwehr was shown the video recordings of all three fights and commented about various portions of the videos and about screen shots that had been taken from the videos. Of relevance to this appeal, Landwehr testified that at one point, in the video recording of the first fight and in a still image taken therefrom, defendant could be seen holding a shiny object in her hand, although nothing more specific about the item could be said at that time. At another point, in the video recording of the second fight, defendant could be seen holding what appeared to be a cloth or a rag in her hand and later transferring something from her left hand to her right hand. A still image was taken from at or near that point of the video recording, and Landwehr testified that it appeared that defendant had a knife in her hand in that

13

still image. At a yet another point, in a slowed-down video recording of the third fight, defendant could be seen with her arm up in the air and with something shiny in her hand making a downward motion multiple times at or near Johnashia. Landwehr acknowledged, however, that the shiny object in defendant's hand at that point could have been defendant's cell phone.

¶ 37   In opposition to the State's theory of the case, the defense presented the testimony of one witness and defendant's own testimony to try to establish that defendant did not have a knife during the fight and that she did not stab the victims, or, at most, that she may have inadvertently or recklessly stabbed or cut the victims with her broken cellphone, which she had in her hand at times while the fight was unfolding. The testimony of the defense witnesses in that regard can be summarized as follows.

¶ 38   Alexis Reeser testified for the defense that during the fight at the park, she never saw defendant with a knife in her hand and never saw defendant go near Jacolby's car. Alexis acknowledged, however, that she was focused on Shatiya at that time (the girl that Alexis was fighting) and that she did not see defendant at all when the fight was occurring so she could not say what defendant was doing. Alexis saw Charee with a baseball bat earlier in the fight but confirmed on the witness stand that she did not see Charee threaten anyone with the bat.

¶ 39   The 30-year-old defendant testified that on the day of the fight, she went to Schmoeger Park with Keambra and Alexis. After the second fight, defendant was walking back toward the vehicle and was talking on her cell phone when John Hill approached her and asked her where was her "b***-a*** brother." Defendant told John not to worry about it, and John "stuck on her." Defendant called Jacolby (her brother), told him that there was a big fight going on at the park and that the females and males were putting their hands on her, and asked Jacolby to come

14

pick her up. Defendant did not have a knife in her possession at any time that day; all she had was her broken silver and white cell phone.

¶ 40    Defendant was fighting other people when Jacolby's car pulled in near the park. Before Jacolby could even get out of his car all of the way, several people rushed him and started fighting with him. Defendant ran toward Jacolby to try to help him. Defendant had her cell phone in her hand the entire time and was swinging her arms. There were about five people on defendant and Jacolby's side and about 30 people on the other side. Defendant was swinging her cell phone everywhere. Defendant and Jacolby were eventually able to get into Jacolby's car and leave the park. At some point thereafter, the police contacted defendant's mother, and defendant's mother brought defendant to the police station voluntarily.

¶ 41    During her testimony, defendant denied that she had a knife in her possession that day, that she had stabbed Charee, or that she had tried to stab Johnashia. Defendant agreed that she was the person in the cell phone video of the third fight with a red fabric stripe on her pants and acknowledged that if she had hit anyone with her phone, that person would have had a cut mark because defendant's cell phone was broken. Defendant also acknowledged that her cell phone could have cut Jacolby's arm and that her cell phone was capable of cutting someone.

¶ 42    After all of the evidence had been presented and the attorneys had made their closing arguments, the trial court took the case under advisement. At a later court date, the trial court announced its ruling, finding defendant guilty of both offenses. In reaching that conclusion, the trial court noted that the credibility of the witnesses was an important factor and that it supported the findings of guilty that the trial court had entered. Defendant filed a motion for new trial, which was subsequently denied.[4] Following a sentencing hearing, the trial court sentenced

---

[4] Although defendant's motion was titled a motion for new trial, it alleged that defendant had not

15

defendant to consecutive prison terms of 28 years for first degree murder and 2 years for aggravated battery. Defendant appealed.

¶ 43                                    II. ANALYSIS

¶ 44        On appeal, defendant argues that she was not proven guilty beyond a reasonable doubt of first degree murder.[5] More specifically, defendant asserts that the State failed to prove that defendant had the mental state necessary for the commission of the offense—that defendant knew her acts created a strong probability of death or great bodily harm to the victim. In support of that assertion, defendant makes the following related contentions: (1) the evidence showed that defendant had a cell phone, and not a knife, in her hand when the stabbing or cutting death occurred; (2) defendant could not have known that her cell phone, a non-lethal item, was potentially certain to cause death or great bodily harm to the victim; (3) no reasonable trier of fact, therefore, could have found defendant guilty beyond a reasonable doubt of first degree murder; and (4) in the alternative, even if the State proved that defendant had a knife in her hand during the fight, defendant still should have been found not guilty of first degree murder because the evidence showed that, regardless of whether defendant had a cell phone or a knife in her hand, she acted recklessly, and not knowingly, in stabbing or cutting the victim. For all of those reasons, defendant asks that we reverse her conviction of first degree murder, that we enter a conviction of involuntary manslaughter instead, and that we remand this case for the trial court to sentence defendant on that offense.

---

been proven guilty of the offenses beyond a reasonable doubt. At the conclusion of the motion, defendant asked the trial court to grant her a new trial or, in the alternative, to amend its finding of guilty on the murder charge to second degree murder or manslaughter.

    [5] As noted above, defendant does not challenge her aggravated battery conviction in this appeal.

16

¶ 45    The State argues that defendant's first degree murder conviction was proper and should be upheld. In response to defendant's specific contentions on appeal, the State asserts that: (1) the record from the bench trial in this case shows that defendant had a knife in her hand, and not a cell phone, when she stabbed or cut the victim; (2) defendant's contention to the contrary is based upon defendant giving greater weight to her own testimony than to the testimony of other witnesses and other evidence presented at the bench trial, a function that it was the trial court's duty to perform as the trier of fact; and (3) the record does not support defendant's claim that she acted recklessly, and not knowingly, where defendant stabbed the unarmed victim multiple times, such that the victim had defensive wounds and a cut through a major artery in her neck. The State contends, therefore, that the record in this case clearly refutes defendant's argument on appeal—that there was insufficient evidence to prove defendant knew her actions were likely to cause death or great bodily harm to the victim. For that reason, the State asks that we affirm defendant's conviction and sentence for first degree murder.

¶ 46    Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). In applying the *Collins* standard, the reviewing court will allow all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *People v. Austin M.*, 2012 IL 111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of

17

review fully recognizes that it is the trier of fact's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. See *Jackson*, 232 Ill. 2d at 281. That same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial, or whether defendant received a bench or a jury trial, and circumstantial evidence meeting that standard is sufficient to sustain a criminal conviction. *Id.*; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). When applying the *Collins* standard, a reviewing court will not reverse a defendant's conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 47    A defendant is guilty of first degree murder, as it was charged in the present case, when the defendant kills a person without lawful justification and knows at the time that his acts created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000); *People v. DiVincenzo*, 183 Ill. 2d 239, 249-50 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882, ¶¶ 23-25. A defendant is guilty of involuntary manslaughter, on the other hand, when the defendant unintentionally kills a person without lawful justification by recklessly performing acts that are likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 7.08 (4th ed. 2000); *DiVincenzo*, 183 Ill. 2d at 250.

¶ 48    The main difference between first degree murder and involuntary manslaughter is the mental state that accompanies the conduct resulting in the victim's death. *McDonald*, 2016 IL 118882, ¶ 51; *DiVincenzo*, 183 Ill. 2d at 249. In the form that murder was charged here, the mental state for murder is knowledge; whereas, the mental state for involuntary manslaughter is recklessness. See *People v. Weeks*, 2012 IL App (1st) 102613, ¶ 34. A person acts knowingly or

18

with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result. 720 ILCS 5/4-5(b) (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000); *Weeks*, 2012 IL App (1st) 102613, ¶ 34. In contrast, a person acts recklessly or with recklessness when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care a reasonable person would use in that situation. 720 ILCS 5/4-6 (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 5.01 (4th ed. 2000); *Weeks*, 2012 IL App (1st) 102613, ¶ 34.

¶ 49        Because direct evidence of a person's mental state often does not exist, the mental state required for a criminal offense may be inferred from the circumstances surrounding the commission of the offense and the character of the defendant's acts. See *People v. Tye*, 141 Ill. 2d 1, 15 (1990); *DiVincenzo*, 183 Ill. 2d at 252; *Weeks*, 2012 IL App (1st) 102613, ¶ 35; *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 42. In addition, when a defendant uses a deadly weapon upon his victim, it may generally be inferred that the defendant either intended to cause death (*People v. Koch*, 306 Ill. App. 3d 634, 637 (1999)) or knew that his acts created a strong probability of death or great bodily harm (*People v. Gresham*, 78 Ill. App. 3d 1003, 1006-07 (1979)). The trier of fact is in the best position to determine whether a particular mental state is present. See *DiVincenzo*, 183 Ill. 2d at 25.

¶ 50        In the instant case, after reviewing the record from defendant's bench trial, we find that the evidence was sufficient to prove the mental state necessary for defendant's first degree murder conviction. See *Collins*, 106 Ill. 2d at 261; *Jackson*, 232 Ill. 2d at 280. We reach that conclusion for two main reasons. First, viewed in the light most favorable to the State, the evidence presented at the bench trial established that defendant had a knife in her hand during the

19

fight and that she used that knife in a stabbing or cutting motion to stab or cut Charee's neck. See *Collins*, 106 Ill. 2d at 261; *Jackson*, 232 Ill. 2d at 280. There was no dispute in the evidence in this case that defendant was using the item she had in her hand as a weapon. The testimony of both Jacolby and defendant confirmed that fact. In addition, three of the State's witnesses who were present at the fight—Sherrce, Johnashia, and Cinese—specifically testified that they saw defendant with a knife in her hand as the fight was occurring. One of those witness, Johnashia, testified further that during the fight, she saw defendant stab Charee in the neck with a knife, saw defendant stab John in the shoulder with a knife, and saw defendant try to stab Shatiya in the head with a knife. Johnashia also testified about the source of the knife—that after Jacolby arrived at the fight, she saw defendant reach into Jacolby's car and take the knife from under one of the seats. Jashae saw defendant reach into Jacolby's car as well but did not see if defendant had removed anything from the car, and multiple witnesses heard or saw defendant get excited or make certain statements about Jacolby being there when Jacolby pulled in. The testimony of the State's witnesses about the knife was further corroborated by the video of the third fight, which showed defendant making a downward stabbing motion with her hand toward Johnashia, and by the testimony and video-recorded statement of Jacolby, wherein Jacolby indicated, albeit somewhat inconsistently at times, that defendant had cut him when she was trying to "stick" another person.

¶ 51 Second, since the facts presented at the bench trial established that defendant had a knife during the fight and that she used that knife to stab Charee in the neck, a reasonable trier of fact could infer from those facts that defendant knew at the time that her acts created a strong probability of death or great bodily harm to Charee.[6] See *Koch*, 306 Ill. App. 3d at 637

---

[6] We take no position in this case on whether the State would have still been able to prove the

20

(indicating that when a defendant uses a deadly weapon upon a victim, it may generally be inferred that the defendant intended to cause death); *Gresham*, 78 Ill. App. 3d at 1006-07 (recognizing that when a defendant uses a deadly weapon upon a victim, it may generally be inferred that the defendant knew that his acts created a strong probability of death or great bodily harm to the victim). That inference regarding defendant's mental state at the time of the offense was also supported and strengthened by the evidence that had been presented as to defendant's conduct (that defendant had used the knife as a weapon during the fight in a stabbing motion) and the severity and nature of the victim's injuries (that the victim had been stabbed multiple times, had a defensive wound, and had one of the major arteries in her neck nearly cut in half). See *Tye*, 141 Ill. 2d at 15 (indicating that the mental state required for a criminal offense may be inferred from the circumstances surrounding the commission of the offense and the character of the defendant's acts); *DiVincenzo*, 183 Ill. 2d at 252 (same); *Weeks*, 2012 IL App (1st) 102613, ¶ 35 (same); *Kibayasi*, 2013 IL App (1st) 112291, ¶ 42 (recognizing that "[t]he factual determination of whether a defendant acted knowingly or with intent may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries"). Because we have found that the mental state element of first degree murder has been sufficiently proven in this case, we affirm defendant's conviction of that offense.

¶ 52    In doing so, we note that although defendant points to evidence that was presented at her bench trial that could possibly support a different conclusion and to potential bias or credibility problems with some of the State's witnesses, those matters were all known to the trial court when the trial court made its ruling in this case. Such matters are of little benefit to defendant

requisite mental state for first degree murder if the evidence had shown that defendant had stabbed the victim with her broken cell phone instead of a knife. The State has not made an argument in that regard in this appeal.

21

here on appeal, when the evidence must be viewed in the light most favorable to the State and the *Collins* standard must be applied. See *Jackson*, 232 Ill. 2d at 280. Nor do we believe that the cases cited by defendant on appeal, which mainly addressed whether a jury instruction on involuntary manslaughter should be given in a particular homicide case, support defendant's arguments here. See, *e.g.*, *People v. Whiters*, 146 Ill. 2d 437, 441 (1992) (upholding the appellate court's reversal of a defendant's voluntary manslaughter conviction and remand for new trial where the trial court denied defendant's request for an involuntary manslaughter jury instruction, even though evidence was presented from which the jury could have found that the defendant had acted recklessly).

¶ 53                                    III. CONCLUSION

¶ 54        For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 55        Affirmed.