NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241466-U

NO. 4-24-1466

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| MICHAEL L. VORRATH, | ) | No. 19CF775 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) the evidence was sufficient for a jury to reasonably conclude defendant was guilty beyond a reasonable doubt of first degree murder, (2) trial counsel's failure to test a water sample was reasonable, and (3) his 45-year prison sentence was not excessive.

¶ 2    Defendant, Michael L. Vorrath, was convicted by a jury of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)). He was subsequently sentenced to 45 years' imprisonment. On appeal, he argues (1) trial counsel was ineffective for failing to submit a water sample for testing, (2) the evidence was insufficient to prove his guilt beyond a reasonable doubt, and (3) his 45-year prison sentence was excessive. We disagree and affirm.

¶ 3                              I. BACKGROUND

¶ 4    In December 2019, defendant was charged by information with first degree murder for causing the death of his wife, Nancy Vorrath, by holding her head underwater. He

was subsequently indicted by a grand jury for said offense. The matter proceeded to trial on two previous occasions, both ending in mistrials in August 2023 and May 2024. The matter proceeded to a subsequent jury trial in August 2024.

¶ 5                                  A. Jury Trial

¶ 6          At trial, Ron Vorrath, Nancy and defendant's son, testified he visited his parents at their home on November 18, 2019. Ron stated Nancy's demeanor was "normal" and that she was preparing for a Thanksgiving gathering. Ron noted Nancy was excited about the birth of a new grandchild the following year, in February. On cross-examination, Ron stated he was aware Nancy had a history of mental illness and had changed her psychiatric provider shortly before her death.

¶ 7          Dr. Matthew Preston testified he was a psychiatrist and treated Nancy on November 18, 2019. He described Nancy's demeanor as "particularly anxious" about "making mistakes at her job, and concern[ed] that she might be in trouble or potentially get fired." He also stated Nancy "mentioned that she was feeling more depressed for the last several months." He perceived Nancy as "hopeful" and wanting to feel better. He noted Nancy was taking multiple medications for depression and a mood stabilizer. He prescribed her a new medication for anxiety and modified some of her existing medication prescriptions. He stated he scheduled Nancy for a follow-up appointment with him for two weeks later and an appointment with a counselor. He agreed antidepressant medications come with a "black box warning" for risk of suicide but stated the warning applies to people "24 and younger" and noted Nancy was 60 years old.

¶ 8          On cross-examination, Dr. Preston stated Nancy had been diagnosed with depression in 2001, which coincided with a previous suicide attempt. He also noted she had a

history of alcohol use disorder but had been sober for 14 years. He recalled Nancy "feeling more sad for several months" and not enjoying activities such as swimming and reading. However, he stated she still "enjoy[ed] spending time with her grandchildren."

¶ 9 Dakota Zimmerman testified she was a registered nurse working for a medical transport company when she was dispatched to the residence of Nancy and defendant on November 23, 2019. She stated she arrived just after 1 p.m. and found Nancy "in a basement laying face up in front of a utility sink with [defendant] doing [cardiopulmonary resuscitation (CPR)]." Zimmerman continued, saying Nancy was "face up, blue in color with legs folded under her in a W position with her head towards the doorway and knees at the base of the sink." Zimmerman performed manual CPR. Eventually, first responders provided ventilation and used a Lund University Cardiopulmonary Assist System (LUCAS) device to mechanically provide chest compressions. On cross-examination, Zimmerman confirmed her report indicated Nancy was observed to be "blue in color, vomit noted around the mouth, [with] second degree burns noted to the left side of [Nancy's] face around the eye and on the left side of her neck proceeding posteriorly to the trapezius area."

¶ 10 Timothy Brown testified he was a firefighter and was dispatched to the residence. He entered the front door and heard defendant yell, "[W]e're down here." When he went to the basement, he observed defendant performing CPR on Nancy. Brown, along with other firefighters who had arrived with him, moved Nancy's body to an open space on the basement floor so they could have more room to perform life-saving measures. He recalled touching the water in the sink and having no reaction to it. He did not smell bleach or any other chemicals in the basement. He did not recall whether there was water on the floor. On cross-examination, he recalled seeing a wound on the back of Nancy's neck and behind her ear.

¶ 11        John Foster testified he was a police officer and responded to the residence. Foster took several photographs of the basement where Nancy was found. Those photographs, showing two folding chairs nearby and water in the sink, were admitted into evidence. He measured the sink's depth as "12-and-a-half inches deep" and said the water depth was "approximately eight inches." Brown recorded the temperature of the water in the sink at 84 degrees Fahrenheit approximately an hour after he had arrived. Foster said he felt the cushions of the folding chairs with the back of his hand, and they felt dry.

¶ 12        On cross-examination, Foster stated he felt the folding chairs for wetness when he was at the residence on November 23 but did not put it in his report until he visited the home again on December 13 with a search warrant. He recalled Nancy having "burn-type marks" on the left side of her face and neck. He also observed an "indentation mark" on her left ankle. He took a sample of the water from the sink at the request of detectives and placed it into evidence.

¶ 13        Eric Esser testified he was a police officer and arrived at the residence on December 13, 2019. He estimated the sink where Nancy drowned was "[a]pproximately three-quarters full." He stated he attempted to put his own head into the sink at the depth the water would have been when Nancy drowned. He stated he performed this both with and without the folding chair found nearby. He acknowledged he was three-and-a-half inches taller than Nancy. Esser stated it was "not comfortable" to keep his face in the sink where the waterline would have been and that he "had to use some strength to leverage [his] body so [he] could get over the sink top."

¶ 14        On cross-examination, Esser conceded he was not at the residence on the day Nancy drowned and only learned through secondhand accounts of how Nancy's body was positioned. He also admitted he was "built differently" than Nancy and he did not know her

- 4 -

weight or how flexible she was. He also acknowledged it was difficult to keep his head positioned in the sink but not "impossible."

¶ 15        Robert Allen testified he was a police officer and arrived on the scene on November 23, 2019. A portion of the recording from his body-worn camera where defendant explained what happened was admitted into evidence. In the video, defendant said Nancy "had this depression." He went on to state "[he] didn't think she would do this…she never said anything about it." He stated she had been depressed for quite a while and that her "meds were starting to wear down." Defendant stated he was watching a football game with Nancy that had started around 11 a.m. An hour and a half later, during halftime, he went upstairs to take a shower. While showering, he "thought [he] heard somebody scream." He did not know what the sound was and noted the distance from the upstairs shower and the basement where Nancy was later discovered. He stated the sound may have been a child outside. Defendant stated it was "ten minutes" from the start of the shower until he found Nancy. He also stated he found Nancy "five minutes" after he heard the "scream" while showering, which he later stated, "sounded more *** like a kid crying." When he came downstairs, he "couldn't find [Nancy]." He said, "she wasn't answering [him] so [he] was like oh no," and he went downstairs and found her. He described finding Nancy on a chair with her head submerged in the water and "already blue." He pulled her out of the water as "quick as [he] could" and performed "chest compressions and mouth-to-mouth." Defendant stated he "thought [he] was too late." He recalled performing CPR for 15 to 20 minutes before calling for help. Defendant told Allen he and Nancy had been married for 42 years. He said, "[W]e loved each other a lot." Then he offered, "[T]his depression just kills people," and he had "known too many people [depression] has taken." He informed Allen that Nancy performed "cleaning jobs" and that she was "cleaning the mop heads." Defendant then

alerted the first responders who were working on Nancy that there was "probably bleach" in the sink. He recalled asking Nancy if she "[thought] about killing herself" sometime before her last psychiatrist's appointment. He told Allen "something clicked in her brain" while he had been showering and "she decided she wasn't going to continue with all of this."

¶ 16 Allen recalled observing the upstairs shower and said it "seem[ed] damp" and there was a "wet sponge." On cross-examination, Allen did not recall any injuries to defendant. Allen also did not notice defendant's clothing to be disheveled. Allen confirmed he learned there was a football game between the University of Illinois and the University of Iowa at 11 a.m. that day. Allen recalled seeing what he believed were burn marks on Nancy but did not see any burn marks on defendant. Allen confirmed his report from November 23, 2019, was listed as a "non-crime" report. Allen confirmed from the recording on his body-worn camera that defendant's hair following the incident was not disheveled.

¶ 17 Dr. Amanda Youmans testified she was a forensic pathologist and performed an autopsy on Nancy on November 25, 2019. Numerous photographs from the autopsy were admitted into evidence. Youmans explained the skin injuries to the left side of Nancy's face and neck was "skin sloughing" caused by her skin being exposed to warm water for a prolonged period of time. She explained the sloughing does not occur uniformly throughout the skin unless the skin has been submerged in water for several days. She noted bruising on Nancy's right shoulder and an abrasion "where the neck meets the chest." Youmans explained the difference between bruising and an abrasion, describing bruising, also known as a contusion, as "bleeding into the skin and the underlying soft tissue." She described an abrasion as "a scrape to the skin" caused by "either pressure directly onto the epidermis in addition to friction from a blunt object." She also noted abrasions to the left and right hip area caused either by blunt force trauma or

sustained pressure. She explained the sternocleidomastoid muscle was the largest muscle in the neck that "runs from the back of the head, down the side of our necks and then it inserts where the collar bone meets the breast plate." She described a "deep hemorrhage" in Nancy's sternocleidomastoid muscle, which she said was caused by "either significant impact or sustained pressure" on the muscle. She stated the injuries to Nancy's sternocleidomastoid muscle could not have been caused by CPR performed manually by first responders or mechanically by the LUCAS device. Youmans also noted injuries, including bleeding in the muscles of the upper back, "upper shoulder blade" area, and back of her neck, would not have been caused by performing CPR or utilizing a LUCAS device. She identified injuries to Nancy's ribs and superficially to her chest from CPR and the LUCAS device that she described as "common." However, Youmans noted there were no internal injuries to the sternum and heart muscles from either CPR or the LUCAS device. She noted petechial hemorrhages in Nancy's right eye, which she said occur when "blood in that area cannot be drained by the veins," which "increases the pressure in the vessels and they burst." She stated petechial hemorrhages are not caused by a lack of oxygen.

¶ 18        Youmans recovered one pill from Nancy's stomach that she identified as bupropion. The toxicology screen performed by Youmans showed Nancy had bupropion, lamotrigine, citalopram, and caffeine in her system at the time of her death. She stated the concentration levels of the drugs in her blood were "nontoxic, nonlethal concentrations." Youmans concluded from her examination that Nancy's cause of death was drowning and the "manner of death [was] homicide." Youmans agreed Nancy's death would have been caused by "pressure being placed on the back or on the neck causing her to be pushed or held down."

¶ 19        The State rested and defendant moved for a directed verdict, which the trial court

denied. The following evidence was presented by defendant.

¶ 20    Two handwritten notes were admitted into evidence. Patricia Ellis, a neighbor, testified that one handwritten note was written by defendant and the other was written by Nancy. Defendant's note was titled "(Psychiatrist Notes) Nancy" and contained various issues or concerns regarding Nancy's medications, social behaviors, and health. Nancy's note listed various titles such as "Deathbed Visions," "One Last Thing Before I Go," "The Art of Dying," "Comfort for the Dying," and "Deathbed Phenomenon."

¶ 21    Dr. Shaku Teas testified she was a forensic pathologist. She noted Dr. Preston had changed Nancy's medications by increasing the amount of bupropion and changing it to once a day in the morning to help with her sleep. She noted Dr. Preston had also reduced the amount of citalopram Nancy had been taking because of Nancy's age. Dr. Teas noted from the coroner's report 11 pills of bupropion were missing but, based on the time the prescription was filled, there should have only been 5 or 6 pills used. She noted the toxicology results showed Nancy's bupropion was "in a therapeutic range," but the "Citalopram [was] elevated."

¶ 22    Dr. Teas noted a person "can drown in a few inches of water" and "only need[s] to really have [their] mouth and [their] nose in the water." She stated manual CPR and a LUCAS device can cause injuries. She noted a LUCAS device has greater force and is "continuous and doesn't stop," whereas humans performing CPR "can't work for more than two or three minutes." The doctor described the injuries to Nancy's face and neck as "burns, second degree or superficial deep burns." She stated Nancy's skin injuries were not sloughing but a "scald burn" from hot water. She noted that at 127 degrees Fahrenheit, the skin will burn in one minute. She attributed the petechial hemorrhaging to Nancy drowning face down. She attributed Nancy's sternocleidomastoid muscle injuries to the resuscitation efforts. She also attributed upper back

and scapula hemorrhaging to Nancy lying on a board or concrete floor and the force of the LUCAS device. Dr. Teas concluded Nancy died by drowning, with the manner being suicide. She explained the basis for her conclusion was Nancy's history of bipolar disorder and depressive mood at the time of her death. She noted Nancy had just changed medications prior to drowning and had attempted suicide once before. She also stated Nancy had not been taking her medication as prescribed. She said "there was nothing at the scene to suggest that somebody else intentionally drowned" Nancy. She stated it was almost "impossible" for Nancy's death to be a homicide.

¶ 23          Seth Landwehr, a police officer, testified he visited the residence on November 23, 2019. He noted the water heater was set to hot and he filled the sink for 3 minutes and 58 seconds, after which he recorded the temperature as 128 degrees Fahrenheit. He noted the temperature of the basement was 66 degrees Fahrenheit.

¶ 24          Defendant rested.

¶ 25          The State called Jason Leigh to testify in rebuttal. Leigh investigated the titles found in the handwritten note by Nancy. He stated three were "definitely books," but he could not find the exact titles of two of them. He did not dispute they could exist, but he could not find them exactly as written on the note.

¶ 26          Dr. Youmans testified Dr. Teas's report noted petechial hemorrhages to the urinary bladder. She disagreed, stating the image was not of the urinary bladder but the back of Nancy's throat. She noted one of Dr. Teas's report pictures was upside down. Dr. Youmans noted further errors in Dr. Teas's report, such as identifying an omohyoid hemorrhage when the omohyoid muscle "cannot be seen in [the] photograph." Dr. Youmans noted other photographs mislabeled by Dr. Teas.

¶ 27 Defendant filed a written motion for a directed verdict, which the trial court denied.

¶ 28 The jury returned a guilty verdict.

¶ 29 B. Posttrial

¶ 30 Defendant filed a motion for a judgment of acquittal notwithstanding the verdict or, alternatively, a new trial. The motion largely argued the evidence was insufficient to support the jury's verdict. The trial court denied defendant's motion.

¶ 31 On October 16, 2024, the matter proceeded to a sentencing hearing. The presentence investigation report (PSI) was admitted with minor changes. The PSI showed defendant's criminal history included two traffic citations: one from 1996 and another from 2008. Defendant was retired. Defendant had type 2 diabetes, took prescription medication, and received twice daily insulin treatment.

¶ 32 The trial court noted it had considered the PSI, statements from family members, arguments from the parties, the statutory factors in aggravation and mitigation, the history and character of defendant, and the nature and circumstances of the offense. The court noted that although defendant's history and character suggested a "high quality individual," deterrence was a factor in aggravation. Regarding mitigating factors, the court noted defendant's lack of criminal history, and the "situation and circumstance" were unlikely to occur again. The court noted defendant's medical condition was "significant" and "would require regular attention while confined." After considering all of the above, the court sentenced defendant to 45 years' imprisonment.

¶ 33 Defendant subsequently filed a motion to reconsider the denial of his motion for a judgment of acquittal notwithstanding the verdict or, alternatively, for a new trial and a motion to

reduce his sentence. The trial court denied both motions.

¶ 34       This appeal followed.

¶ 35                             II. ANALYSIS

¶ 36       On appeal, defendant argues (1) trial counsel was ineffective for failing to test the water sample taken from the sink, (2) the evidence was insufficient to prove his guilt, and (3) the trial court imposed an excessive sentence. We begin by addressing defendant's claim regarding the sufficiency of the evidence.

¶ 37                   A. Sufficiency of the Evidence Claim

¶ 38       When examining the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess the witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 39       For first degree murder, the State had to prove (1) defendant performed the acts which caused Nancy's death and (2) when he did so, he knew that his acts would cause Nancy's death. 720 ILCS 5/9-1(a)(1) (West 2018). "An individual acts with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26; see 720 ILCS 5/4-5(b) (West 2018). A defendant's mental state is rarely proven by direct evidence, and as such, is generally inferred from the

character of the defendant's acts and from the circumstances surrounding the commission of the offense. *People v. Eubanks*, 2019 IL 123525, ¶ 74. "[T]he trier of fact is in the best position to determine whether a particular mental state is present." *People v. Pollard*, 2015 IL App (3d) 130467, ¶ 27.

¶ 40    Defendant's arguments for why the evidence was insufficient to prove his guilt essentially recall all of the evidence from the trial in a light most favorable to supporting his contention that Nancy drowned by suicide. Accordingly, we need not explicitly recount all of his arguments here.

¶ 41    The jury was tasked with weighing all of the evidence, including all of the inconsistent evidence, and determining whom, if anyone, to find credible from the testimonies provided. It is clear from the history of this case that any rational trier of fact would find the facts challenging, given there had been two previous mistrials. However, we are not retrying defendant on appeal but reviewing the evidence in a light most favorable to the prosecution to determine if *any* rational trier of fact could have found defendant guilty beyond a reasonable doubt. This standard makes it the jury's responsibility to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *Murray*, 2019 IL 123289, ¶ 19.

¶ 42    The jury was in the best position to work through the evidence at trial. There was no dispute that Nancy died from drowning. The crux of the dispute was whether Nancy drowned by suicide, as the defense's expert witness contended, or by homicide at the hands of defendant, as the State's expert witness contended. However, resolving this kind of evidence is precisely the

function of the jury. "[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). After reviewing the evidence at trial, we find nothing so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of defendant's guilt. Therefore, we find a jury could reasonably and rationally conclude beyond a reasonable doubt that defendant held Nancy's head underwater, and when he did so, he knew his actions would cause her death.

¶ 43                                    B. Ineffective Assistance of Counsel Claim

¶ 44          Next, defendant argues trial counsel was ineffective for failing to test the water sample taken from the sink in which Nancy drowned.

¶ 45          A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To prevail on a claim of ineffective assistance of counsel, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To show deficient performance, a defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 687). To establish prejudice, a defendant must show, "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A "reasonable probability" has been interpreted as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Id.* "A defendant must satisfy both prongs of the *Strickland* test and a failure to

satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 46        Defendant notes the police retained and stored a sample of the water from the sink in which Nancy drowned. He also notes the record does not show the police tested the water sample or that defense counsel sought to have the water sample tested. Defendant argues had the water sample been tested and it was shown his DNA was not present, it would have further supported his version of events that he told the police on the day Nancy died. However, he concedes the lack of his DNA in the water sample would not be conclusive proof.

¶ 47        A strong presumption exists that defense counsel's conduct was within the wide range of reasonable professional assistance and all counsel's decisions were made in the exercise of reasonable professional judgment. *People v. Cloyd*, 152 Ill. App. 3d 50, 57 (1987). A defendant must overcome the strong presumption the challenged action or inaction by counsel may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Generally, matters of trial strategy or tactics, even when made in error, will not support a claim of ineffective assistance. *People v. Perry*, 224 Ill. 2d 312, 355 (2007).

¶ 48        It appears the water sample taken by police was not tested, so it is simply unknown whether defendant's DNA would have been present in the water. Counsel would have been aware of this at the time of trial. We find it perfectly reasonable for counsel to forgo testing the water for defendant's DNA. Had counsel insisted on testing the water sample, one of two results would have ensued: (1) defendant's DNA would have been present, which could have created further evidentiary problems for defendant, or (2) defendant's DNA would not have been present. However, as defendant notes, this would not have been conclusive evidence, either. Because testing the water for defendant's DNA could have been potentially further

incriminating, we conclude counsel's failure to do so was reasonable. Accordingly, we find

defendant has failed to show counsel rendered ineffective assistance by failing to test the water

sample.

¶ 49                                    C. Excessive Sentence Claim

¶ 50          Lastly, defendant argues his sentence was excessive, noting the trial court

disregarded the various mitigating evidence, even though the record shows much of this evidence

was mentioned by the court at the sentencing hearing.

¶ 51          "The legislature sets forth by statute the range of permissible sentences for each

class of criminal offense." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A reviewing court affords

great deference to a trial court's sentencing judgment because, "having observed the defendant

and the proceedings, [it] is in a far better position to consider such factors as the defendant's

credibility, demeanor, general moral character, mentality, social environment, and habits than a

reviewing court, which must rely on a 'cold' record." *People v. Little*, 2011 IL App (4th)

090787, ¶ 24. A sentence that falls within the applicable statutory limits is reviewed for an abuse

of discretion. *People v. Price*, 2011 IL App (4th) 100311, ¶ 36. "A sentence within statutory

limits will not be deemed excessive and an abuse of the court's discretion unless it is 'greatly at

variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the

offense.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20 (quoting *Fern*, 189 Ill. 2d at 54).

¶ 52          Here, defendant was found guilty of first degree murder, a Class M felony. 720

ILCS 5/9-1(a)(1) (West 2018). Ordinarily, defendant would be subject to a term of 20 to 60 years

in prison for this offense. 730 ILCS 5/5-4.5-20(a) (West 2024). However, because Nancy was 60

years old at the time of her death, defendant was subject to a term of 20 to 100 years in prison.

*id.* § 5-5-3.2(a)(8). Defendant was sentenced to 45 years' imprisonment. Because defendant's

sentence was within the permissible range, we begin with the presumption the sentence was proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 53 The abuse of discretion standard is deferential to sentencing courts. *People v. Fisher*, 407 Ill. App. 3d 585, 589 (2011). In this case, the trial court found a need for deterrence as a factor in aggravation. The court provided numerous mitigating reasons that defendant cites when arguing his sentence was excessive. However, the fact that mitigating factors existed in defendant's case does not outweigh the aggravating factor the trial court noted in its decision. A trial court is not required to afford greater weight to mitigating factors than to the severity of the offense. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010); see *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002) (noting the seriousness of the offense is the most important sentencing factor). Nor does the presence of mitigating factors require a minimum sentence. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Ultimately, the court was in a better position to observe defendant's conduct and weigh the need for a sentence beyond the minimum statutory requirement. To be clear, first degree murder is a serious offense, if not the most serious of all offenses. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. Nothing from this record suggests the court's sentencing determination was arbitrary, fanciful, or unreasonable. Accordingly, we find no reason to conclude the court's sentence was disproportionate to the nature of the offense.

¶ 54                                     III. CONCLUSION

¶ 55 For the reasons stated, we affirm the trial court's judgment.

¶ 56 Affirmed.